**Rafael MADRIGAL, Petitioner,**

v.

**James YATES, Warden, Respondent.**

**Case No. CV 07–7251–GAF (MLG).**

United States District Court,
C.D. California,
Western Division.

Sept. 3, 2009.

---

Eric S. Multhaup, Eric S. Multhaup Law Offices, Mill Valley, CA, Jan Stiglitz, Jeffrey Chinn, Justin Brooks, California Western School of Law California Innocence Project, San Diego, CA, for Petitioner.

Sarah Jean Farhat, CAAG—Office of the Attorney General, Los Angeles, CA, for Respondent.

## ORDER ACCEPTING AND ADOPTING FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE AND GRANTING CONDITIONAL WRIT OF HABEAS CORPUS

GARY A. FEESS, District Judge.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court has reviewed the petition and all of the records and files herein, as well as the Report and Recommendation of the United States Magistrate Judge. The Court has conducted a *de novo* review of those portions of the Report and Recommendation to which objections were filed.

IT IS ORDERED that the Petition for Writ of Habeas Corpus is GRANTED. IT IS FURTHER ORDERED that Petitioner shall be brought to retrial within sixty (60) days of the date of entry of judgment or alternatively, be discharged from the adverse consequences of the conviction and judgment in this case.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

MARC L. GOLDMAN, United States Magistrate Judge.

This is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. On January 18, 2002, a Los Angeles County Superior Court jury convicted Petition-

er Rafael Madrigal, Jr. of the attempted murder of Ricardo Aguilera (Cal.Penal Code §§ 664, 187(a)). The jury also found true that Petitioner personally used a handgun (Cal.Penal Code § 12022.53), and that the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang. (Cal.Penal Code § 186.22(b)(1)). (Clerk's Transcript ("CT") 54–55.) Petitioner was sentenced to a term of 25–years–to–life with the possibility of parole on the attempted murder charge, plus an additional 28 years on the gang enhancement. (CT 134.)

Petitioner raises four grounds for relief in this petition: (1) ineffective assistance of counsel ("IAC") for failure to identify and present exculpatory evidence; (2) IAC for failure to put Petitioner on the witness stand after informing the jury that Petitioner would testify; (3) IAC for failure to investigate and present corroborating witness testimony to support Petitioner's alibi that he was at work at the time of the Aguilera shooting; and (4) a *Brady*[1] claim based on the prosecution's failure to disclose exculpatory evidence.

## I. *Facts and Procedural History*

### A. Facts[2]

During the summer of 2000, members of the rival Marianna Maravilla ("Marianna") and Ford Maravilla ("Ford") gangs of East Los Angeles engaged in a series of retaliatory attacks, leading to the Aguilera shooting. The attacks began on May 27, 2000, when Marianna gang member Steve "Pollo" Romero was shot and killed. (Reporter's Transcript ("RT") 991.) Marianna retaliated, resulting in the shooting death of Ford gang member Marcos "Fat Boy" Torres on June 29, 2000. (RT 991–92.) The Aguilera shooting followed six days later.

On the afternoon of July 5, 2000, Ricardo Aguilera was visiting Michael and Carlos Moreno in East Los Angeles. Michael Moreno had previously been a Marianna gang member. (RT 409.) Sometime between 3:15 and 3:20 p.m., Michael Moreno and Aguilera were outside when a truck and a car slowed in front of the Morenos' apartment. Michael and Aguilera ran inside and Michael told his mother that Ford gang members were outside planning to do something. Michael indicated that "Go–Go," later identified as Petitioner's co-defendant, Francisco Olivares, was one of the individuals in the truck.

Michael, Carlos and Aguilera went outside to bring in the family's other children. While they were outside, the truck stopped at the apartment's driveway and the passenger repeatedly asked Aguilera, "Where are you from[?]" Aguilera understood that the passenger was asking for his gang affiliation and replied three times that he was from "nowhere." Aguilera turned and ran towards the apartment. (RT 257.) The passenger then fired several shots from the car, one of which hit Aguilera in the back of the head. (RT 257.) Aguilera survived the shooting.

Aguilera could not identify the shooter, but told a Los Angeles County Sheriff's detective that he had previously seen the shooter at Baby's Liquors, a Ford gang hangout on Olympic Boulevard. (RT 624.) On July 11, 2000, Carlos Moreno identified a photograph of Petitioner, taken from the

---

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. These facts are drawn both from the California Court of Appeal decision in Petitioner's case and the trial transcript. *People v. Rafael Madrigal, Jr.,* Case No. B170431 (unpublished opinion). (Lodgment 11.)

Los Angeles County Sheriff's gang identification book, as the passenger and shooter.[3]

Based on this identification, Petitioner was arrested on July 20, 2000. (RT 556.) At the time of his arrest, Petitioner was married with three children, had been working steadily since 1994, had moved away from East Los Angeles to Riverside County, and owned a home. He had no prior record except for a misdemeanor conviction for possession of an item worth less than $400 with the serial number removed (Cal.Penal Code § 537(e)(1)).

## B. Petitioner's Trial

On January 5, 2001, the state filed a one-count information charging Petitioner with the attempted murder of Aguilera. The information also alleged firearm use and gang enhancements. (CT 54–55.) The state filed an amended information adding Olivares as a co-defendant on the same charges, and also charging Olivares with assault with a deadly weapon (Cal.Penal Code § 245(a)(2)). (CT 60–A–C.) The trial of Petitioner and Olivares began on January 4, 2002.

### 1. The Prosecution's Case

Three eyewitnesses linked Petitioner and/or his co-defendant Olivares to the shooting: Carlos Moreno, and Jessica and Salvador Huezo, teenage neighbors of the Morenos. As noted above, on July 11, 2000, Carlos Moreno identified Petitioner from a series of photographs as the passenger of the truck and the shooter.[4] (RT 394–96.) However, Carlos failed to identify Petitioner as the passenger during a corporeal lineup held in July 2001. (RT 404, 455.) Carlos testified at trial that he had been reluctant to participate in the lineup due to concern for his family's safety.[5] (RT 397.) Although Carlos' fear for his family's safety was "in [his] mind at the time" of the lineup, he stated that the reason he did not identify Petitioner at the lineup was that, "at the time [he] really didn't recognize him." Carlos "did [his] best and couldn't pick anybody out that day." (RT 452.)

Carlos nevertheless identified Petitioner at trial as the truck's passenger. (RT 393.) He said that when he walked into the courtroom, he expected to see the shooter. (RT 452.) Carlos testified that when the shooting occurred, he was standing about eighteen feet in front of the truck. (RT 432.) He initially testified that he saw the passenger for "a good five minutes," but later testified that he saw the passenger for only a few seconds. (RT 432–33.) Carlos described the passenger as a "little gang banger" in his early twenties—certainly no older than twenty-five years of age—who had a mustache and dark goatee, wore a white baseball cap with an orange brim, and appeared to have a cleanly-shaved head. (RT 419, 421–22.) Carlos testified that he did not see a gun at the time of the shooting (RT 417) and never saw the passenger holding or firing a gun. (RT 391, 437.)

Jessica and Salvador Huezo also testified. Jessica Huezo stated that she was

3. At trial, Carlos testified that he never actually saw the passenger holding a gun. (RT 436.)

4. The photo used to identify Petitioner apparently depicted him at about 17 years of age (RT 748), whereas he was 25 years old in July 2000.

5. The basis for Carlos' concern was a police report that was circulating on the "streets" with his name and the names of other witnesses, that someone had shot his brother Michael (the bullet apparently grazed Michael's face, causing no serious injury), and that he believed that he and his family were being followed. (RT 398, 401–402.)

across the street from the Morenos' apartment when the shooting occurred and only saw the truck's driver. (RT 299.) At a live lineup in July 2001, Jessica picked out both Petitioner and another individual as possibly being the driver of the truck, but she did not identify Petitioner as the passenger. (RT 306.) In court, Jessica stated that the only reason she selected Petitioner as the driver was because he was the only one who had a goatee in the "six-pack" photographs she had been shown, and the driver of the truck had a goatee. (RT 317.) In court, she stated that she never saw the passenger of the truck. (RT 300, 316, 324.) She further testified that she did not remember seeing Petitioner in the truck on July 5, 2000. (RT 307.) Jessica did, however, positively identify Francisco Olivares as the driver. (RT 300.) Therefore, Jessica did not identify Petitioner at trial as being involved in the Aguilera shooting.

Salvador Huezo, Jessica's younger brother, testified that he was about twenty or twenty-five feet to the rear and on the passenger side of the truck when he saw the passenger lean out with a gun. (RT 341, 342.) He ducked and then ran away when he saw the gun, so he did not see the passenger fire the gun. (RT 342.) Salvador testified that he saw the passenger's face and identified Petitioner in court as the passenger. (RT 345.) Salvador also testified that he had identified Petitioner in a photo "six-pack," but in fact he had never participated in a photographic lineup which included Petitioner's photo.[6] (RT 346–47, 587–88.) Salvador also testified that the passenger had a "goatee," although according to Salvador's description of the passenger's facial hair, the passenger did not actually have a goatee, but rather a long mustache, often referred to as a "Fu Manchu" mustache. (RT 358–59.) Salvador further described the passenger as having a shaved head, but did not recall the passenger or anyone else wearing a white baseball cap with an orange brim. (RT 359.) Finally, Salvador stated that when he walked into the courtroom that day, he expected the shooter to be there. (RT 364.)

The final prosecution witness was Los Angeles County Sheriff's Detective Michael Delmuro, an expert on East Los Angeles gangs, who had investigated the Aguilera shooting. Detective Delmuro testified that, as of July 5, 2000, Petitioner was a Ford gang member with the nickname "Mugsy." (RT 551–52.)

Delmuro's testimony that Petitioner was a Ford gang member and the eyewitness identification testimony provided by Carlos Moreno and Salvador Huezo was the only evidence connecting Petitioner to the Aguilera shooting. There was no physical evidence linking Petitioner to the crime. (RT 586–87, 605.)

## 2. Petitioner's Defense

In his opening statement, Petitioner's counsel, Andrew Stein, laid out the contours of an alibi defense and a third-party culpability defense. (RT 197–200.) Stein stated that the evidence would show that Petitioner was at work at Proactive Packaging & Display in Rancho Cucamonga until 3:30 p.m. on the day of the shooting. (RT 197–99.) Stein told the jury that Robert Howards, the plant manager of Proactive Packaging, would testify that he was certain that Petitioner was at work at the

---

**6.** During a sidebar between the court, the district attorney, and Petitioner's trial counsel, Andrew Stein, the district attorney stated that Salvador had never been shown a "six pack" of photos of Petitioner, but rather had been shown one which included Olivares, and therefore, Salvador was "mistaken" that he had photographically identified Petitioner. (RT 347.)

time of the shooting, and that Steve Finley, Petitioner's supervisor, would also testify that Petitioner was at work in Rancho Cucamonga at the time of the shooting. (RT 199.) Stein also told the jury that Petitioner would testify about who he believed actually shot Aguilera. (RT 200.) Stein finally stated that the state's own gang expert would testify that a gang member who testifies against another member of his gang is signing his own death warrant. (*Id.*)

Stein first called Steve Finley as a witness. Finley testified that Petitioner ran a lamination machine and that if Petitioner had left before 3:00 p.m. on July 5, 2000, production would have stopped. (RT 689, 707.) However, production documents from July 5, 2000 showed ongoing production on Petitioner's machine only until 1:40 p.m., after which time Petitioner's absence would not have stopped production. (RT 730, 732.) Finley also testified that Petitioner and his brother, Victor Madrigal, carpooled to work every day, clocked in and clocked out at the same time, and that Victor had clocked out at 3:30 p.m. on July 5, 2000. (RT 711, 722, 728.) Finley further testified that Petitioner had not clocked out on July 5, 2000. Finley signed a time card, most likely on July 6, 2000, indicating Petitioner had been at work on July 5, 2000, until 3:32 p.m., but that he had probably done so after Victor Madrigal brought to his attention that Petitioner had not clocked out that day.[7] (RT 705, 721, 723.) However, Finley did not specifically remember whether Petitioner and his brother left together on July 5, 2000. (RT 734.) Finley conceded that an employee could leave 30 minutes to an hour early without him noticing. (RT 728.) While Finley had told investigators in September and December 2000 that he was sure Peti-

tioner worked his entire shift on July 5, 2000, Finley admitted that he could not be absolutely certain that Petitioner had in fact worked his entire shift that day. (RT 735, 739.)

Petitioner's cousin, Ricardo Pimienta, testified that Petitioner did not have a goatee when he attended Ricardo's wedding on July 1, 2000, four days before the Aguilera shooting. (RT 742.) Ricardo authenticated several pictures of Petitioner taken at the wedding, which Ricardo described as depicting Petitioner without a goatee. (RT 742–43.)

Petitioner's wife, Veronica Madrigal, testified that she believed that the picture of Petitioner in the "six-pack" lineup photos shown to the witnesses in the Aguilera shooting depicted the way Petitioner looked when he was about sixteen years old, which was when they first began dating. (RT 748.) Veronica also testified that Petitioner drove her to work on the morning of July 5, 2000, and that because they only had one car, he drove her to work each morning before driving to his own job. (RT 750.) Veronica also testified that, although he had been a Ford gang member in high school, Petitioner was no longer a gang member. (RT 756.) On cross-examination, she conceded that, at a birthday party at his sister's house in May 2000, Petitioner had spoken with Ford gang members who were congregated in front of a house near his sister's home. (*Id.*)

Petitioner's defense rested with the conclusion of Veronica's testimony. (RT 759.) Stein never called Robert Howards, the plant manager of Proactive Packaging, to testify that Petitioner was at work at the time of the shooting, as he had promised in his opening statement. Stein also never

---

7. Finley had regularly handwritten in times on Petitioner's time cards that year. Thus, it was not unusual for him to have done so on July 5, 2000. (RT 695–704.)

put Petitioner on the stand to deny his involvement in the shooting and to identify the Ford gang member whom Petitioner believed actually shot Aguilera, even though his opening statement informed the jury that he would do so. In fact, Stein did not present evidence of third-party culpability at all. Stein came closest to doing so when he cross-examined Detective Delmuro regarding Ford gang member Manuel Mendoza. (RT 585.) Delmuro testified that, in a gang booklet photograph, Mendoza had a light goatee. (*Id.*) Delmuro also testified that Mendoza was then in custody for an unrelated shooting, but that the Los Angeles County Sheriff's Department had not compared the bullets fired in that incident to the bullets fired at Aguilera. (*Id.*)

On January 18, 2002, after four days of deliberations following the three-day trial, the jury found Petitioner and Olivares guilty of all charges. (RT 920–23.)

### 3. Petitioner's Motion for New Trial

Prior to sentencing, the trial court granted Stein's motion to continue the case for preparation of a motion for new trial. (CT 110.) After several continuances, Stein filed a motion on September 6, 2002, for comparison testing of ballistic evidence from the Aguilera shooting with a .38 caliber revolver that had been seized from Manuel Mendoza on June 8, 2001. (Supplement to Clerk's Transcript ("SCT") 38, 48; RT 1001.) The results of the tests showed that the loaded .38 caliber revolver found in Mendoza's possession was the weapon used in the Aguilera shooting. (SCT 26, 64–65.) On May 9, 2003, Stein noticed a motion for a new trial to present the results of these tests as evidence of Mendoza's participation in the Aguilera shooting. (SCT 24.)

The trial court held a series of hearings on the motion for new trial in September 2003. At the hearing, Stein called Mendoza as a witness. After spelling his name and disclosing his date of birth, Mendoza asserted his Fifth Amendment right to remain silent on every question asked by Stein. (RT 935–950.)

Stein then examined Petitioner. Petitioner testified that in May 2000, he saw Mendoza and other Ford gang members at his sister Lorena Parra's house in East Los Angeles, where he often visited on the weekends.[8] (RT 954–55, 957.) Petitioner testified that Mendoza had a gun and left with some of the gang members. (RT 955.) When Mendoza and the others returned after 20 minutes, Mendoza reportedly told Petitioner to get off the street because he had just "lit up a dude [Steve "Pollo" Romero] from Marianna at Baby's." (RT 956.) Petitioner testified that he was again at his sister's house in June 2000 when he saw Mendoza and a gang member Petitioner knew only as "Bam–Bam." Mendoza and Bam–Bam reportedly told Petitioner to leave because "they had just blasted at Largo," a.k.a. "Froggy," a former Ford gang member who had become a Marianna gang member. (RT 957–58.) Petitioner testified that he was also at his sister's house on the day that Marcos "Fat Boy" Torres, a Ford gang member, was killed. (RT 958–59.) Mendoza and several other Ford gang members whom Petitioner saw there reportedly discussed Torres' killing as retaliation for Romero's killing. (RT 960.)

Petitioner then testified about his interactions in jail with Mendoza—who was incarcerated at that time for an unrelated offense—and Olivares. (RT 964.) Peti-

---

**8.** Petitioner later clarified that the gang members were not at his sister's house, but congregated around a neighboring house.

tioner testified that, sometime between July and December 2000, he was present during a conversation between Mendoza and Olivares in which they discussed a gun Mendoza had hidden and that Petitioner later believed to be the gun used in the Aguilera shooting. (RT 964.) Petitioner further testified that, sometime in the summer or fall of 2001, he observed Mendoza and Olivares arguing about the gun. (RT 967.) Olivares reportedly reproached Mendoza for getting arrested with the .38 caliber revolver after he had told Mendoza to get rid of it. (*Id.*) Petitioner also testified that Mendoza later told Olivares that if he had known that Olivares was "going to act this way [about the gun] [Mendoza] would have never have done nothing with him." (RT 968.) Petitioner interpreted this as an admission by Mendoza that he shot Aguilera. (RT 968, 985.)

Petitioner testified that prior to trial, he had told Stein that Mendoza was Aguilera's shooter, but had not informed Stein why he believed this. (RT 968.) Petitioner testified that he had failed to inform Stein because: (1) Olivares threatened that Petitioner would be stabbed if he did so, and (2) Petitioner was at work at the time of the shooting, was demonstrably innocent, and therefore had no reason to implicate anybody else for the crime. (RT 969, 989.) Petitioner testified that he finally informed Stein of the jailhouse conversations and arguments between Mendoza and Olivares in March 2003.[9] (RT 982, 985.)

Stein lastly questioned Detective Delmuro. Delmuro confirmed that Petitioner had put his life and the well-being of his family in jeopardy by implicating Mendoza.

(RT 994–95.) Delmuro testified that in 2000, Mendoza was an active Ford gang member. (RT 992.) Police reports and testimony by Delmuro showed that Mendoza was the prime suspect in the March 11, 2001, walk-up shooting of Fraser Maravilla gang member Jose Vera with a .380 caliber semi-automatic handgun (to be distinguished from the .38 caliber revolver used in the Aguilera shooting). (RT 995, 1004; SCT 84–89.) Delmuro testified that it was common for a single weapon, such as the .38 caliber revolver, to be passed among members of the same gang. (RT 1001.)

Delmuro also testified regarding his failure to disclose information about Mendoza to the district attorney in Petitioner's case. Delmuro testified that he had never informed the prosecutor that Mendoza was a suspect in another gang shooting, even after the prosecutor told Delmuro that Stein believed Mendoza to be Aguilera's actual shooter. (RT 993, 1002–1003.) Delmuro also testified that he had not believed that the .38 caliber revolver found in Mendoza's possession on June 8, 2001, was used in the shooting of Aguilera because Petitioner had already been arrested for that crime. (RT 1000–1001.)

The trial court denied Petitioner's motion for a new trial on September 26, 2003. (RT 1018.) As noted, the court sentenced Petitioner to 25–years–to–life with the possibility of parole plus an additional 28 years for the enhancements. (CT 131, 134–35.)

## C. Post–Sentence Procedural History

Petitioner appealed his conviction to the California Court of Appeal, claiming that

9. It is clear that Petitioner actually gave Stein this information earlier than March 2003, because Stein told the court at trial in January 2002 about the jailhouse conversation and argument between Olivares and Mendoza: "My client, if he testifies, is going to testify [that Olivares] and Mr. Mendoza, who is presently in custody for an unrelated shooting, confessed the crime to each other in front of him while he was in the county jail." (RT 592.) Petitioner's confusion on the timing is of no consequence here.

Stein was ineffective in failing to conduct ballistics comparison testing on the bullet casings from Aguilera's shooting with the .38 caliber revolver seized from Manuel Mendoza on June 8, 2001. (Lodgment 5.) On May 26, 2005, while his direct appeal was pending, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, claiming ineffective assistance of counsel for failure to present the exculpatory ballistics evidence and other evidence of third-party culpability. (Lodgment 8.) On June 6, 2005, the California Court of Appeal ordered that the state habeas petition be considered concurrently with Petitioner's direct appeal. (Lodgment 9.) On October 17, 2005, 2005 WL 2626936, the California Court of Appeal affirmed Petitioner's conviction (Lodgment 11), and also denied his petition for writ of habeas corpus. (Lodgment 12.)

On November 21, 2005, Petitioner filed a petition for review in the California Supreme Court (Lodgment 13), which was summarily denied on January 4, 2006. (Lodgment 14.) On October 31, 2006, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, raising the following grounds for relief: (1) IAC for multiple failures to present and investigate evidence of third-party culpability; (2) IAC for failure to investigate and present corroborating evidence of Petitioner's alibi defense; (3) IAC for failure to investigate and present other exculpatory evidence to corroborate Petitioner's innocence; and (4) denial of due process by failure of the prosecution to disclose exculpatory evidence. (Lodgment 15.)

Among the 23 exhibits filed in support of Petitioner's petition for writ of habeas corpus to the California Supreme Court was the transcript of a surreptitiously taped jailhouse conversation between Petitioner's co-defendant Olivares and Olivares' girlfriend on August 17, 2001. (Lodgment 15,

Ex. I.) Stein had been given a copy of the tape of this conversation on November 5, 2001, prior to trial. (CT 76.) In the conversation, Olivares told his girlfriend that Petitioner had enlisted his brother, Victor Madrigal, to "find out who really did it," i.e., who really shot Aguilera. (*Id.*) This angered Olivares, who believed this to be "none of [Petitioner's] business." (*Id.*) Olivares also said that Petitioner "looks at me or he looks at Dreamer [Mendoza's gang moniker] you know what I'm saying? So he either already knows but ... he don't know shit you know, he don't know what happened. ..." (*Id.*) The exhibits also included a letter from Stein to Eric Multhaup, who was representing Petitioner in his habeas petition before the California Supreme Court, in which Stein attempted to explain some of the choices he made at trial. (Lodgment 15, Ex. W.) The petition for writ of habeas corpus was summarily denied by the California Supreme Court on June 13, 2007. (Lodgment 16.)

On November 1, 2007, Petitioner filed a petition for writ of habeas corpus in this Court, raising the same grounds for relief that were raised in the petition for writ of habeas corpus filed in the California Supreme Court. On February 5, 2008, Respondent filed an answer. On February 25, 2008, the Court appointed attorney Eric Multhaup to represent Petitioner. Petitioner is also represented pro bono by attorneys for the California Innocence Project. On May 1, 2008, Petitioner filed a request for authorization to conduct discovery and a motion for an evidentiary hearing, which was granted in part and denied in part on July 3, 2008.

On November 3, 2008, the Court held an evidentiary hearing to more fully develop the record related to Petitioner's IAC and *Brady* claims. At the hearing, the Court heard testimony from Petitioner; Robert Howards, manager of Proactive Packaging,

where Petitioner was employed at the time of the shooting; Petitioner's brother, Victor Madrigal; and Petitioner's trial counsel, Andrew Stein.[10] The Court also received records filed under seal from the Los Angeles County Sheriff's Office regarding the investigation of the May 27, 2000, murder of Steve "Pollo" Romero.

On December 5, 2008, Petitioner filed a post-hearing brief. On December 19, 2008, Respondent filed a reply to Petitioner's post-hearing brief. On December 29, 2008, Petitioner filed a reply to Respondent's post-hearing brief. On January 2, 2009, Respondent filed a sur-reply to Petitioner's reply brief. The matter is now ready for decision.

## II. *Standard of Review*

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d)(1), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was decided on the merits in state court only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." The only source for clearly established federal law is the holdings of the Supreme Court, as opposed to the dicta, at the time of the state court decision. *Carey v. Musladin,* 549 U.S. 70, 74, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006).

The Supreme Court has explained that a state court decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result." *Brown v. Payton,* 544 U.S. 133, 141, 125

S.Ct. 1432, 161 L.Ed.2d 334 (2005). "A state court need not cite or even be aware of [Supreme Court] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.' " *Mitchell v. Esparza,* 540 U.S. 12, 16, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) (per curiam) (quoting *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam)).

A state court decision involves an "unreasonable application of" clearly established federal law if the state court identifies the correct governing legal principle from the decisions of the Supreme Court, but unreasonably applies that principle to the facts of the case. *Brown,* 544 U.S. at 141, 125 S.Ct. 1432; *Williams v. Taylor,* 529 U.S. 362, 407–08, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). It is not enough that a federal court conclude "in its independent judgment" that the state court decision is incorrect or erroneous. *Yarborough v. Alvarado,* 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (quoting *Woodford v. Visciotti,* 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam)). "The state court's application of clearly established law must be objectively unreasonable." *Lockyer v. Andrade,* 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). AEDPA imposes a " 'highly deferential standard for evaluating state-court rulings' which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone,* 543 U.S. 447, 455, 125 S.Ct. 847, 160 L.Ed.2d 881 (2005) (quoting *Woodford,* 537 U.S. at 24, 123 S.Ct. 357).

■ The claims raised in the instant petition were raised before the California Supreme Court, but that court did not issue a reasoned decision. (Lodgments 15 and 16.) Accordingly, this Court must

---

**10.** The substance of each witness' testimony will be discussed in detail below.

"look through" the unexplained California Supreme Court decision to the last reasoned decision as the basis for the state supreme court judgment. *See Shackleford v. Hubbard,* 234 F.3d 1072, 1079 (9th Cir. 2000) (citing *Ylst v. Nunnemaker,* 501 U.S. 797, 803–04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)); *see also Pham v. Terhune,* 400 F.3d 740, 742 (9th Cir.2005) ("In reviewing a state court's summary denial of a habeas petition, this court must 'look through' the summary disposition to the last reasoned decision.").

The California Court of Appeal, in a reasoned opinion, rejected Petitioner's IAC claim regarding Stein's failure to have ballistics testing on the bullet casings found at the crime scene compared to the gun seized from Manuel Mendoza. (Lodgment 11.) The California Court of Appeal also issued a written decision on the merits rejecting Petitioner's IAC claim arising from Stein's failure to call Robert Howards as a defense witness. (Lodgment 12.) Therefore, this Court will consider the reasoning of the California Court of Appeal to determine whether the California Supreme Court's decision is contrary to, or an unreasonable application of, clearly established federal law.

■ However, as there is no reasoned state court decision denying any of the other claims raised in this petition, this Court must assume that the state court has considered all the issues and "perform an 'independent review of the record' to ascertain whether the state court decision was objectively unreasonable." *Reynoso v. Giurbino,* 462 F.3d 1099, 1109 (9th Cir. 2006) (quoting *Himes v. Thompson,* 336 F.3d 848, 853 (9th Cir.2003) (explaining that an independent review of the record "is not *de novo* review of the constitutional issue, but rather, the only method by which [the court] can determine whether a silent state court decision is objectively unreasonable")).

### III. Ineffective Assistance of Counsel for Failure to Investigate and Present Exculpatory Evidence

Petitioner first contends that Stein's representation was deficient for failing to investigate and present exculpatory evidence. (Pet. at 6.) More specifically, Petitioner claims that Stein provided ineffective assistance by: (1) failing to present as evidence at trial the jailhouse tape of co-defendant Olivares' conversation with his girlfriend in which Olivares made statements that seem to exculpate Petitioner; (2) failing to call Petitioner to the stand to testify to his innocence and the third-party culpability of Manuel Mendoza after promising the jury in opening statement that Petitioner would testify; (3) failing to interview or call Robert Howards, the plant manager at Petitioner's place of employment, who would have testified that Petitioner was at work, forty miles away, at the time of the Aguilera shooting, after telling the jury that he would testify; and (4) failing to interview or call Petitioner's brother, Victor Madrigal, as a witness at trial.

The Sixth Amendment right to counsel guarantees not only assistance, but effective assistance of counsel. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Duncan v. Ornoski,* 528 F.3d 1222, 1233 (9th Cir. 2008). To prevail on a claim of ineffective assistance of counsel, a petitioner must establish two things: (1) counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms; and (2) the deficient performance prejudiced the defense, i.e., "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Strickland,* 466 U.S. at 687–88, 694, 104 S.Ct. 2052. A failure to make either showing is grounds for denying a petitioner's claim. *Id.* at 697, 104 S.Ct. 2052.

With respect to the performance prong of the *Strickland* standard, a reviewing court must examine the reasonableness of counsel's challenged conduct under all the circumstances, including the facts of the particular case as viewed at the time of the conduct. *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Scrutiny of counsel's performance must be "highly deferential," and the petitioner must overcome the presumption that, under the circumstances, the challenged action might be considered strategically sound. *Id.* at 689, 104 S.Ct. 2052; *see also Yarborough v. Gentry,* 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."); *Bell v. Cone,* 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) ("We cautioned in *Strickland* that a court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight."); *see also Pinholster v. Ayers,* 525 F.3d 742, 760 (9th Cir.2008).

To establish prejudice under the second prong of *Strickland,* the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. It is not enough to show that counsel's errors had some conceivable effect on the outcome of the proceeding because "virtually

every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693, 104 S.Ct. 2052. The Ninth Circuit has recognized that "prejudice may result from the cumulative impact of multiple deficiencies." *Harris ex rel. Ramseyer v. Wood,* 64 F.3d 1432, 1438 (9th Cir.1995) (quoting *Cooper v. Fitzharris,* 586 F.2d 1325, 1333 (9th Cir.1978)).

In evaluating a claim of ineffective assistance of counsel, the Court must consider whether the state court's decision was objectively unreasonable under *Strickland.* *See Rompilla v. Beard,* 545 U.S. 374, 380, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

### A. Failure to Present the Jailhouse Audiotape

 Petitioner contends that he was deprived of effective assistance of counsel by Stein's failure to present at trial the secretly recorded jailhouse audiotape made of co-defendant Olivares' conversation with his girlfriend on August 17, 2001, during which Olivares makes statements that appear to exculpate Petitioner. (Pet'r Br. at 14.) The Court agrees with Petitioner that Stein's failure to introduce the tapes into evidence constituted ineffective assistance of counsel.

On November 5, 2001, prior to Petitioner's trial, the prosecution turned over to Stein a number of audiotapes. Stein sought and obtained a continuance of the trial, ostensibly to review and transcribe the tape recordings. (Evidentiary Hearing ("EH"), Ex. 9 at 51.) However, Stein's trial file contains no transcripts of any audiotapes (EH, Ex. 2–a, 2–b), nor could he recall whether he ever listened to the audiotapes or arranged for transcripts of the audiotapes to be made. (EH 130–131.) The trial record demonstrates that Stein

did not present any evidence of the August 17, 2001, audiotape to the jury. At the evidentiary hearing, Petitioner testified that when he asked Stein what was on the audiotapes that were turned over by the prosecution, Stein stated that "there was nothing on the tapes that could help [Petitioner] or anything that could hurt [him] on them either." (EH at 164.)

Relevant excerpts of the audiotape of the secretly recorded August 17, 2001, conversation between Olivares and his girlfriend are as follows:

*Olivares (co-defendant):*

"I got in a fight."

*Gloria (Olivares' girlfriend):*

"Why?"

*Olivares:*

"I'm gonna tell you the truth. All right you ready? It's a long story. I got in a fight with Mugsy [Petitioner's nickname]."

*Gloria:*

"About what?"

*Olivares:*

"... I was in there with him and I told him you know what check this out ... I fucking heard that he told his brother to go find out who really did it and all this bullshit and I go ... what the fuck you wanna know for, it's none of your fucking business you know what I'm saying, and he goes well I'm here for you and we got into it and I go you know what— I'm not lying to you, I told him, it's none of your business why you should know, you know ... Right here I didn't put you here you know, I didn't jump you in or nothing you know. I didn't hang around with you out there, I don't hang around with you in here. I told him all that shit and you know what—he's trying to tell me like how come I don't want to tell him you know ... but you know I

don't tell nobody shit you know because it's nobody's business, straight on you know ... I found out he was out there trying to fucking ask ... well he told his brother to ask the homies what happened you know so one, some foolish shy boy ... My homeboy called him and ... that fool shy boy told him heh, the fool's asking you know so I told him, heh fool don't tell him shit ... no? And he said no, none of us told him shit, you know."

*Gloria:*

"So (unintelligible), what does he want?"

*Olivares:*

"Don't know. He told me what you think I'm going throw rat and I go, well, it's better, it's better this way that you don't know nothing that way I can't say if you rat you know what I mean? Uh huh. Cause to go around you have to know every detail of what happened, you know, if he doesn't know nothing it's better that way. I won't think that you know."

*Gloria:*

"What'd he say?"

*Olivares:*

"He said like well that's your opinion you know. I went that's my opinion you know and I know that .... and then that's when I told him, fool don't think that I don't know that your brother's out there asking you know ... it's none of his fucking business—I mean why does he want to know for."

*Gloria:*

"Oh, he got surprised?"

*Olivares:*

"Yeah, and he says, you know, and then after I told him that and I told him ... I know that every time you make a comment—like oh, you're a killer like you go, ya right, like you know what I mean. Cause they always clown him like ...

fucking like Mugsy ... putting him down and all this bullshit you know and he's like ya right and he looks at me or he looks at Dreamer [Manuel Mendoza's gang moniker] you know what I'm saying? So he either already knows but ... he don't know shit you know, he don't know what happened cause he's, he's I know he's been asking cause when I tell him I didn't have shit to do with it you know?"

(EH, Ex. 5, 6.)

It is apparent to the Court from reading the transcript and listening to the audiotape that Olivares, Petitioner's co-defendant, had recently had an argument with Petitioner regarding Petitioner's attempts to have his brother, Victor Madrigal, ask around to find out who committed the Aguilera shooting. Olivares was angry with Petitioner for making these inquiries and informed Petitioner that it was none of his business who committed the shooting. Further, Olivares repeatedly told his girlfriend that Petitioner did not know who actually committed the Aguilera shooting, although Olivares suspected that Petitioner believed Olivares and Manuel Mendoza to be the actual perpetrators.[11]

█ The Court finds that Stein's failure to transcribe and introduce this audiotape into evidence at trial was not reasonable under prevailing professional norms because the audiotape provides compelling evidence of Mendoza's and Olivares's involvement in the shooting, and of Petitioner's apparent non-involvement. *See Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir.1994) (holding that trial counsel's fail-

ure to investigate evidence that someone else was the perpetrator constituted deficient performance). The failure to investigate is "especially egregious when a defense attorney fails to consider potentially exculpatory evidence." *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir.2002); *see also Reynoso*, 462 F.3d at 1112; *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir.1999) ("A lawyer who fails to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict, renders deficient performance."). "When an attorney fails to examine potentially exculpatory evidence, although he repeatedly assured the petitioner of his intention to do so, the *Strickland* presumption that the failure is 'sound trial strategy' is surmounted." *Jones v. Wood*, 114 F.3d 1002, 1011 (9th Cir.1997). While the audiotape may not have completely demonstrated Petitioner's factual innocence, it likely would have "raise[d] sufficient doubts as to that question as to undermine confidence in the verdict," *Lord*, 184 F.3d at 1093, particularly if introduced in conjunction with the alibi evidence that Stein also failed to present.

The Ninth Circuit has found evidence of "third party confessions" to be "highly exculpatory" because "if believed, would *necessarily* exonerate the defendant of the primary offense." *Perry v. Rushen*, 713 F.2d 1447, 1452 (9th Cir.1983) (emphasis in original). There is simply no reasonable explanation for Stein's failure to introduce the jailhouse audiotape of Olivares' August 17, 2001 conversation with his girlfriend,

---

**11.** Respondent questions the tape's evidentiary value, arguing that the conversation is "confusing" because it is unclear to whom Olivares is referring in the discussion with his girlfriend. (Resp't Br. at 21–22.) The Court has listened to and read transcripts of the audiotape. Although the conversation is somewhat difficult to follow due to the poor quality of the recording and the extensive use of slang, the Court nevertheless finds that the tape is sufficiently clear to understand the context of the conversation between Olivares and his girlfriend, as well as the benefit of the tape to Petitioner's defense.

nor did Stein provide any reasons during his testimony at the evidentiary hearing. Nor may this Court "assume facts not in the record in order to manufacture a reasonable strategic decision for [Petitioner's] trial counsel." *Alcala v. Woodford,* 334 F.3d 862, 871 (9th Cir.2003). The Court must decide whether Stein's performance was deficient "based on what [Stein's] reasons for his decision actually were, not on the basis of what reasons he could have had for those decisions." *Moore v. Czerniak,* 534 F.3d 1128, 1144 (9th Cir.2008).[12]

Stein failed to present highly reliable and exculpatory evidence in support of a defense that someone else, namely Olivares and Manuel Mendoza, committed the shooting.[13] Furthermore, Stein could have sought to authenticate and introduce the audiotapes into evidence without even having to call Petitioner to testify. This makes Stein's failure to introduce the tapes into evidence even more egregious. Accordingly, the Court finds that this amounts to deficient performance by Stein.

■ I further find that Petitioner has adequately demonstrated prejudice arising from Stein's deficient performance. Stein's failure to introduce the tapes into evidence (or apparently even to listen to them) "served to deprive [Petitioner] of the most critical evidence supporting his best defense." *Sanders,* 21 F.3d at 1461. If Stein had introduced the audiotapes, the

jury would have been presented with compelling evidence from Petitioner's co-defendant that Petitioner was innocent of the crime with which he had been charged and was, in fact, seeking to determine who actually had committed the crime. The audiotapes also provided compelling evidence to bolster Petitioner's claim that Mendoza was the actual shooter because, in the tapes, Olivares describes how Petitioner is looking suspiciously at Olivares and Manuel Mendoza. Thus, because the audiotapes could likely have been admitted into evidence at trial, Petitioner has met his burden of proof that Stein's failure to investigate and introduce this evidence caused him prejudice.

Additionally, Stein's failure to present the audiotapes at trial "was all the more questionable in light of the weaknesses in the prosecution's case" against Petitioner. *Lord,* 184 F.3d at 1094. Here, "the case against [Petitioner] was only weakly supported by the record and therefore more likely to have been affected by errors than one with overwhelming record support." *Alcala,* 334 F.3d at 872 (quoting *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052) (internal quotations omitted). Because the only evidence against Petitioner were conflicting eyewitness statements, the prosecution's case was far from compelling. *See Rios,* 299 F.3d at 810 (finding prejudice

12. Respondent speculates as to possible reasons why Stein did not introduce the tape at trial, including that it would have been difficult to authenticate the audiotape because Olivares would have refused to testify and there is no record that Olivares' girlfriend was available. (Resp't Reply Br. at 22–23.) As discussed above, the Court is not permitted to speculate as to Stein's purported strategical decisions when there is no evidence in the record to support them. However, the Court notes that there are alternative ways in which the tapes could have been authenticated, such as by jail officials who had tape

recorded the conversation or by another person sufficiently familiar with Olivares' voice.

13. Had Stein listened to the tapes and identified the exculpatory passages, he could have attempted to offer the tapes into evidence at trial under Cal. Evid.Code § 1220 ("admission of party") or Cal. Evid.Code § 1230 ("declarations against interest"). Given the high probative value of the tape, it is reasonably probable that the trial court would have admitted the evidence under either of these hearsay exceptions over the prosecutor's objections.

more likely because the "State's case ... was at best a close one" where there was no physical evidence linking the defendant to the crime and "no weapon found, no fingerprints, no gunpowder residue, no DNA evidence"). Similarly, in this case, there was no evidence linking Petitioner to the gun used in the Aguilera shooting, no matching fingerprints or hair, and no DNA evidence. Apart from the conflicting testimony of two eyewitnesses and Detective Delmuro's opinion that Petitioner was a gang member, there was no other evidence linking Petitioner to the crime for which he was convicted.

Finally, the fact that the jury deliberated for four days after a three-day trial underscores the weakness of the case against Petitioner. *See, e.g., Mayfield v. Woodford,* 270 F.3d 915, 932 (9th Cir.2001) (one and one-half day deliberation during penalty phase shows close case, when jury arrived at guilty verdict in two hours); *Lawson v. Borg,* 60 F.3d 608, 613 (9th Cir.1995) (five day deliberation shows close case); *United States v. Kojayan,* 8 F.3d 1315, 1323 (9th Cir.1993) (deliberations over two days show close case); *Gibson v. Clanon,* 633 F.2d 851, 855 (9th Cir.1980) (nine hours of deliberation shows close case).

Accordingly, I conclude that there is a reasonable probability that the verdict would have been different had Stein introduced the audiotape into evidence. The state supreme court's decision to the contrary is objectively unreasonable. Consequently, the Court finds that Petitioner is entitled to relief on his claim of ineffective assistance of counsel.

## B. Failure to Call Petitioner to the Stand After Promising to Do So in Opening Statement

■ Petitioner next contends that Stein's representation was constitutionally deficient because he informed the jury in opening statement that Petitioner would testify but then failed to put Petitioner on the witness stand. Petitioner contends that he was fully prepared to testify regarding his alibi that he was at work at the time of the Aguilera shooting as well as his reasons for suspecting that Manuel Mendoza was the actual shooter, but that Stein inexplicably, and without notifying Petitioner beforehand, failed to call him as a witness.

During his opening statement to the jury, Stein informed the jury that Petitioner would take the stand in his own defense:

> You're also going to hear from the People's own gang expert that if a gang expert takes the—a gang member takes the stand and testifies against his own and says who did the crime it is like signing your death warrant. *And you're going to hear from my client. He'll explain to you who he believes did that crime that he is charged with.* And you will hear from the People's own witness that what that will mean to my client when he takes the stand in this case. That he's basically signing his own death warrant by testifying in open court that a fellow gang member committed this crime. (3 RT 200.) (Emphasis added.)

Despite this explicit promise that Petitioner would testify, Stein rested his case without ever calling Petitioner to the stand.

At the evidentiary hearing, Petitioner testified that he was fully prepared to testify at his trial (EH 166), and it was not until Stein's closing argument that he first realized that Stein was not calling him as a witness. (EH 173.) When asked why he did not take the stand, Petitioner testified: "He [Stein] just told me I'm not going to use you after all." (EH 174.) Stein, however, gave a contradictory explanation at the evidentiary hearing as to why he failed

to call Petitioner to testify after promising to do so in opening statement: "The co-defendant was threatening my client during trial, and my client changed his mind and wasn't going to testify. That stands out. I still remember. That's an unusual thing to have happened." (EH 154.) Stein further stated: "And then it all came back about what happened during trial with Mr. Olivares threatening to kill my client. And my memory is it wasn't just my client, it was my client's family—his wife, his children, if they knew where his family lived." (EH 155.)

Stein did admit at the evidentiary hearing that, at least at some time before he made his opening statement, he and Petitioner had agreed that Petitioner would testify. (EH 160.) When asked whether he recalled agreeing with Petitioner to put him on the stand, despite the threats from co-defendant Olivares and other active Ford gang members, Stein stated: "Again, I don't recall that agreement, but I would never make an opening statement to a jury saying the defendant is going to testify unless the defendant had agreed to testify ahead of time." (*Id.*)

Petitioner testified at the evidentiary hearing that the threats from co-defendant Olivares and other Ford gang members not to testify about Manuel Mendoza's alleged involvement in the Aguilera shooting continued unabated from the time of his altercation with Olivares in jail around August 2001 (which was the subject of the audiotaped conversation between Olivares and his girlfriend on August 17, 2001) to the time of his trial in January 2002. (EH 164–165.) Petitioner testified that, despite these continuing threats to his safety, he remained determined to testify at trial in order to prove his innocence. (EH 166–167.) Petitioner further testified that the threats from Olivares and other Ford gang members did not suddenly increase in seri-

ousness immediately before his trial, as implied by Stein's testimony at the evidentiary hearing. (EH 167.) Petitioner emphatically stated that Stein was not telling the truth when he testified at the evidentiary hearing that Petitioner had refused to testify at the last minute because of threats from co-defendant Olivares. (EH 167.)

After having heard the testimony of both Petitioner and Stein at the evidentiary hearing, the Court finds that Petitioner's testimony regarding this issue is more credible than Stein's. From the Court's observation of both witnesses' demeanor, the Court finds that Stein's "sudden" recollection as to why he did not put Petitioner on the stand was not believable. While testifying at the evidentiary hearing, Stein was hostile and uncooperative. He repeatedly stated that he could not recall any of the events that occurred from the time he began representing Petitioner through his motion for new trial after Petitioner's conviction. That he suddenly had a clear recollection of this single event, when he could not recall anything else, strains credulity.

Further, as Petitioner has pointed out, Stein's statements at the evidentiary hearing that Petitioner decided at the last moment not to testify because of threats from co-defendant Olivares are contradicted by multiple inconsistent statements on the subject made by Stein. (Pet'r Br. at 22–32.) For example, on September 26, 2003, Stein argued in support of a motion for new trial that the prosecution had committed a *Brady* violation by failing to disclose evidence of Manuel Mendoza's involvement in the March 11, 2001, shooting of Jose Vera. (6 RT 1008–1009.) When the trial court asked Stein to explain how evidence of Mendoza's assault on Vera would have been relevant and admissible at trial if

disclosed by the prosecution, Stein argued as follows:

> *Stein:* I believe under [Evidence Code section] 1101 and *People v. Hall* that I would have been able to put on the evidence that at that time the defendant testifies—
>
> *The Court:* Well, how is he connected to this crime? That's the—
>
> *Stein:* The defendant would testify about the admission by the party to committing the crime. Then I would have put on evidence under 1101 to show not only has—did the perpetrator Mr. Mendoza do this crime but we have evidence that he did a similar crime and another crime in which he had the gun that was used in this case. (6 RT 1011–1012.)

Thus, Stein argued in September 2003 that he would have called Petitioner to testify if only the prosecution had disclosed evidence regarding Manuel Mendoza's March 2001 assault on Jose Vera. Logically, Stein would not have made the argument to the trial court that he would have put Petitioner on the stand if Petitioner had in fact refused to testify because of threats against him by Olivares. Stein made other statements at the September 2003 hearing on the motion for new trial that also contradict his testimony at the evidentiary hearing that Petitioner refused to testify because of Olivares' threats:

> *The Court:* Right. But you're telling me you would have put it on because you could have connected it up through the defendant's testimony but the problem is that he didn't tell you so that you wouldn't have put it on, correct?
>
> *Stein:* No. If the defendant—if I had known this I would have put the defendant on the stand. This evidence was not given to me. It corroborates the

defendant's version of the facts. (6 RT 1016–1017.)

Stein also stated that "[t]he new evidence allows me to make an informed decision to put the defendant on." (6 RT 1018.) Thus, in September 2003, much closer in time to Petitioner's trial than the evidentiary hearing held in November 2008, Stein repeatedly told the trial court that he exercised control over whether Petitioner would testify and would in fact have put Petitioner on the stand if the prosecution had disclosed the Vera assault. This directly contradicts Stein's testimony at the evidentiary hearing that Petitioner refused at the last moment to testify.

Stein's testimony at the evidentiary hearing that Petitioner refused to testify because of Olivares' threats is further contradicted by Stein's response to a letter written to him by Petitioner's appellate counsel, Eric Multhaup, on September 24, 2006. (EH, Ex. 12.) In the September 24, 2006, letter, Multhaup asked Stein, "Was there a reason that you did not call defendant to testify at trial?" Stein responded to Multhaup's question in a letter dated October 11, 2006, as follows:

> With respect to [the question], the clearest answer I can give is that regardless of the subject matter in general, the defendant did not want to testify. Many defendants do not. The issue of priors would have been discussed as would the issue of what to expect on cross-examination. If you are asking about the alibi, he did not want to testify to it and felt strongly that it could be proved by other witnesses. As the jury was out for several days the alibi testimony must have been problematic for the jury. Also, had he wanted to testify, which he did not, I would have advised him with respect to the state of the People's case and his defense case. As you can tell from the record, part of the defense was

that he was employed, had dropped out of the gang life, had a family and was trying to start a new life.

(EH, Ex. 12 at 4.)

Thus, Stein's answer on October 11, 2006, suggested that, for various reasons, Petitioner *never* wanted to testify, not that Petitioner suddenly changed his mind during trial because of threats made against him by co-defendant Olivares. Stein's suggestion on October 11, 2006, that Petitioner never wanted to testify is belied by the fact that Stein informed the jury in opening statement that Petitioner would in fact testify, and Stein's statement at the evidentiary hearing that he "would never make an opening statement to a jury saying the defendant is going to testify unless the defendant had agreed to testify ahead of time." (EH 160.)

Therefore, because the Court credits Petitioner's testimony that he did not tell Stein in the middle of trial that he would not testify, there is no reasonable explanation for why Stein failed to call Petitioner to the stand. Moreover, the record does not demonstrate any tactical reason for Stein to announce to the jury that he would call his client to testify on his own behalf and then subsequently change his mind. *See Ouber v. Guarino,* 293 F.3d 19, 27 (1st Cir.2002) ("Neither the state court nor the [Respondent] has managed to identify any benefit to be derived from such a decisional sequence, and we are unable to see the combination as part and parcel of a reasoned strategy."); *see also United States ex rel. Hampton v. Leibach,* 347 F.3d 219, 259 (7th Cir.2003) ("Making such promises and then abandoning them for reasons that were apparent at the time the promises were made cannot be described as legitimate trial strategy.").

While there are no Ninth Circuit Court of Appeals cases directly addressing the issue of ineffective assistance of counsel arising from a broken promise that a defendant will testify, the Court finds persuasive similar cases decided in other United States Courts of Appeal. For example, in *Hampton,* the court found ineffective assistance of counsel where the trial attorney promised the jury in opening statement that the defendant would tell the jury that he was innocent but then failed to deliver on his promise that the defendant would testify. 347 F.3d at 257–260. The defendant was charged with sexual assault, rape and robbery, stemming from an assault on two women at a concert by a large group of gang members. *Id.* at 222. The defendant was tied to the crimes solely by conflicting eyewitness testimony. *Id.* at 222–225. During opening statement, defendant's trial counsel promised the jury, "Mr. Hampton will testify and tell you that he was at the concert. Mr. Hampton will tell you that he saw what happened but was not involved with it." *Id.* at 257. The attorney later decided not to call the defendant to the stand because he was worried that the fact that his client was at the concert would aggravate the possibility of the jury thinking that the defendant was "guilty by association." *Id.* at 258.

The Court of Appeals for the Seventh Circuit found that the state appellate court's determination that the unfulfilled promise that the defendant would testify was simply a "change in trial strategy" was unreasonable. *Id.* The court noted that the possible "guilt by association" was already known to the attorney at the time he stated that his client would testify. The court went on to note that the "broken promises themselves supplied the jury the reason to believe there was no evidence contradicting the State's case, and thus to doubt the validity of Hampton's defense." *Id.* at 260.

Similarly, in *Ouber*, the court found ineffective assistance of counsel where defense counsel asserted during his opening statement that jurors would hear what happened from the defendant herself but then subsequently decided to advise the defendant against testifying. 293 F.3d at 27. The United States Court of Appeals for the First Circuit acknowledged that each of these decisions, taken alone, may have been professionally reasonable judgments, but "[t]aken together, however, they are indefensible." *Id.* The court concluded that, "in the absence of unforeseeable events forcing a change in strategy, the sequence constituted an error in professional judgment." *Id.*

As in *Hampton* and *Ouber*, Stein promised the jury that it would hear Petitioner himself identify who had actually committed the crime for which Petitioner was on trial, but then reneged on his promise without explaining to the jury why he did so. As discussed previously, there were no "unforeseeable events" at Petitioner's trial that would "warrant ... changes in previously announced trial strategies." *Ouber*, 293 F.3d at 29. According to Petitioner's evidentiary hearing testimony, the danger to Petitioner and his family from co-defendant Olivares' threats was obvious from the outset of the case, and thus does not justify Stein's decision to promise the jury that Petitioner would testify and then renege on that promise.

Therefore, when the failure to present the promised testimony cannot be chalked up to unforeseeable events, as the Court has determined is the case here, the attorney's broken promise may be unreasonable, for "little is more damaging than to fail to produce important evidence that had been promised in an opening." *Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir.1988); *see also Ouber*, 293 F.3d at 28 ("A broken promise of this magnitude taints both the lawyer who vouchsafed it and the client on whose behalf it was made."); *Hampton*, 347 F.3d at 259 ("Promising a particular type of testimony creates an expectation in the minds of jurors, and when defense counsel without explanation fails to keep that promise, the jury may well infer that the testimony would have been adverse to his client and may also question the attorney's credibility.") The Court concludes that Stein's actions constitute deficient performance.

■ Petitioner was prejudiced by Stein's failure to call him as a witness after promising the jury in opening statement that he would do so. Because Petitioner did not take the stand, the jury did not get to hear Petitioner, in his own words, describe the details of his alibi that he was at work at the time of the shooting. Moreover, the jury was also deprived of hearing the basis for Petitioner's belief that Manuel Mendoza was the actual shooter. Finally, despite the standard instructions to the jury that it cannot hold a criminal defendant's failure to take the stand against him, it is reasonable to conclude that the jury nevertheless did so here. The jury could have surmised that the reason for Petitioner's failure to testify, after his trial attorney promised he would, was that Stein had realized, at some point during trial, that Petitioner was not a credible witness or, even worse, that he would commit perjury if allowed to take the stand. *See Hampton*, 347 F.3d at 238 ("Hampton's failure to take the stand as promised gave rise to a negative inference about what the content of his testimony might have been."); *see also Ouber*, 293 F.3d at 28 ("When a jury is promised that it will hear the defendant's story from the defendant's own lips, and the defendant then reneges, common sense suggests that the course of trial may be profoundly altered.").

As noted before, the prosecution's case against Petitioner was weak, depending solely upon conflicting and inconsistent eyewitness accounts. In a borderline case, such as this one, "even a relatively small error is likely to tilt the decisional scales." *Ouber*, 293 F.3d at 33. Under these circumstances, the error here—failing to present the promised testimony of the defendant himself—was "not small, but monumental." *Id.* Because the error was egregious, the Court finds that, but for Stein's deficient performance, the outcome of the trial would likely have been different. Therefore, Petitioner is entitled to habeas relief.[14]

## C. Failure to Investigate and Present Alibi Testimony from Robert Howards

■ Petitioner contends that he was deprived of the effective assistance of counsel by Stein's failure to interview or present the alibi testimony of Petitioner's supervi-

sor, Robert Howards. (Pet'r Br. at 3.) Petitioner first raised this IAC claim in his petition for writ of habeas corpus to the California Court of Appeal. (Lodgment 8.) In a brief written decision, the California Court of Appeal addressed Petitioner's claim as follows:

As to petitioner's claim that his trial counsel rendered ineffective assistance of counsel by failing to call Robert Howard [sic] as a witness at trial, a claim supported by a defense investigator's unsigned and unsworn statement containing hearsay, petitioner has failed to demonstrate ineffective assistance of counsel and has failed to allege facts sufficient to warrant the relief sought (citations).

(Lodgment 12.)

Because the California Court of Appeal decided the claim in a written decision on the merits,[15] this Court is required to determine whether the Court of Appeal's decision was contrary to, or an unreason-

14. Respondent contends that Petitioner waived his right to present this ineffective assistance claim because Petitioner did not personally raise the issue with the court when Stein did not call him. (Resp't Brief at 24.) Respondent cites *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir.1993), for the proposition that a defendant's silence in the face of an attorney's decision not to have the defendant testify is a waiver of the right to testify and cannot form the basis of an ineffectiveness claim. The Court has reviewed the *Nohara* case, along with *United States v. Edwards*, 897 F.2d 445, 447 (9th Cir.1990), on which *Nohara* relies, and finds that both cases are factually distinguishable.

Petitioner is not claiming that Stein was ineffective for refusing to allow him to testify, but that Stein's failure to have him testify, after telling the jury he would do so, was ineffective. *Nohara* and *Edwards* did not involve fact patterns similar to that in the present case: an attorney promising the jury that his client would testify but then failing to call his client to the stand. In both *Nohara* and *Edwards*, there was no indication made to the

court or the jury that the defendant wished to testify. The concern in *Nohara* and *Edwards* was that "[t]o hold that a defendant may abide by his lawyer's advice and not take the stand and then invalidate the trial because he so acted is not fair to the government." *Edwards*, 897 F.2d at 447. In contrast, Petitioner informed Stein that he wished to testify and Stein relayed this information to the court, the prosecution, and the jury by proclaiming Petitioner's intent to take the stand in opening statement. It was that action that constituted deficient performance, and *Nohara* and *Edwards* have no bearing on that issue. Accordingly, Petitioner did not waive his right to raise this claim.

15. It is unclear whether the California Court of Appeal decided Petitioner's claim on the merits or rather dismissed it because it was procedurally defaulted for failure to present sufficient evidence. The Court notes that Respondent has failed to raise the issue of procedural default. (Resp't Br. at 7.) Therefore, the Court will assume that the Court of Appeal intended this as a decision on the merits and will treat it as such.

able application of, clearly established federal law. The court of appeal found that Petitioner had not met his burden of establishing either deficient performance or prejudice.[16] The California Court of Appeal's decision was an objectively unreasonable application of *Strickland.*

When Stein was first retained and assumed representation of Petitioner in January 2001, the public defender provided Stein with a copy of the defense file compiled as of that date. (EH, Ex. 3.) The defense file contained an August 25, 2000, notarized statement by Robert Howards, attesting to the fact that Petitioner was at work at the time of the shooting. (EH, Ex. 3 at 99–100.) The defense file also contained a report of an initial telephone interview and a subsequent in-person interview of Howards by the public defender investigator. (EH, Ex. 3 at 94.) In both interviews, Howards stated unequivocally that Petitioner was at work on July 5, 2000, until 3:30 p.m. Howards stated that he knew Petitioner was at work on July 5, 2000 because Petitioner was the only employee who could run a certain labeling machine, and if the machine had stopped running, Howards would have known about it. Howards stated, "There is no way [Petitioner] could have left work early without me knowing it." (EH, Ex. 3 at 94.)

In the public defender file that Stein received, there was also a report from Detective Lugo of the Los Angeles County Sheriff's Department regarding his December 20, 2000, interview of Steve Finley, Petitioner's immediate floor supervisor at Proactive Packaging. (Ex. 2–b at 11–14.)

Finley told Detective Lugo that he believed Petitioner worked until 3:30 p.m. on July 5, 2000. However, Finley conceded, under Detective Lugo's questioning, that, at least hypothetically, an employee could leave up to an hour before the end of his shift and not be noticed. (EH, Ex. 2–b at 13.)

It was established at both the trial and the evidentiary hearing that the Aguilera shooting occurred sometime between 3:15 to 3:20 p.m. on July 5, 2000. (EH 21–22; RT 230–31.) Detective Lugo testified at Petitioner's trial that the driving time between Proactive Packaging at 10981 Jersey Boulevard in Rancho Cucamonga and the crime scene at 939 South McBride Street in East Los Angeles is approximately 50 minutes. (EH, Ex. 11–A–5; 5 RT 764–765.) Therefore, Stein knew at the time he assumed representation that the prosecutor would necessarily be required to present evidence that Petitioner could have left work up to an hour early, around 2:30 p.m., driven for 50 minutes to get to 939 South McBride Street, just in time to join co-defendant Oliveras in committing the shooting sometime between 3:15 and 3:20 p.m.

However, Stein failed to interview Howards or to call him as a witness. At the evidentiary hearing, Stein could not recall whether he ever even spoke with Howards. (EH 134.) Howards, on the other hand, clearly recalled that he only spoke to Stein on one occasion, when Howards was served with a subpoena duces tecum and directed to bring the Proactive Packaging employment records to court on April 30, 2001.[17] (EH 62–63.) Howards testified

---

16. The Court of Appeal relied upon the state law standard for ineffective assistance of counsel from *People v. Ledesma,* 43 Cal.3d 171, 217–218, 233 Cal.Rptr. 404, 729 P.2d 839 (1987), which cites the *Strickland* standard.

17. At the evidentiary hearing, Petitioner's counsel misstated the appearance date as April 13, 2001. The subpoena itself shows that the records were subpoenaed for April 30, 2001. (EH, Ex. 2A, at 41). The Clerk's

that Stein did not ask him any questions regarding Howards' knowledge of Petitioner's whereabouts on July 5, 2000. (*Id.*) Howards testified that, after handing Stein the records and asking Stein what Howards should do next, Stein said, "We'll let you know. You can go." (*Id.*) Howards further testified that he never spoke with Stein again after bringing him the employment records and was never contacted to testify at Petitioner's trial. (*Id.*)

Stein's trial file reflects that, on November 1, 2001, he had an attorney service company attempt to subpoena nineteen Proactive Packaging employees, including Howards, for a November 5, 2001, trial date. (EH, Ex. 2–a at 88–139.) Of the nineteen employees, the attorney service actually served only Steve Finley and six others, but did not serve Howards. (EH, Ex. 2–a at 154.) Stein did not make any further attempt to subpoena Howards. Despite Stein never having interviewed Howards nor having him under subpoena for the trial that commenced on January 7, 2002, he gave an opening statement in which he specifically informed the jury that Howards would testify.[18]

Although Stein made a "sound strategic choice to present an alibi defense . . . [he] nonetheless failed in his duty to present that defense reasonably and competently." *Alcala*, 334 F.3d at 870. First, despite the information Stein possessed from the beginning of his representation of Petitioner that Howards would be a very strong alibi witness, he failed to interview Howards. It is well established that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. The Ninth Circuit has repeatedly held that a "lawyer who fails adequately to investigate, and to introduce into evidence, [evidence] that demonstrate[s] his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Avila v. Galaza*, 297 F.3d 911, 919 (9th Cir.2002) (citing cases).

■ "A lawyer has a duty to investigate what information . . . potential eye witnesses possess[ ], even if he later decide[s] not to put them on the stand." *Avila*, 297 F.3d at 920; *see also Lord*, 184 F.3d at 1095 (noting that counsel cannot make judgments about the credibility and appearance of a witness without "looking him in the eye and hearing him tell his story"). As the Ninth Circuit has noted:

> "Counsel is not obligated to interview every witness personally in order to be adjudged to have performed effectively. However, where (as here) a lawyer does not put a witness on the stand, his decision will be entitled to less deference than if he interviews the witness. The reason for this is simple: A lawyer who interviews the witness can rely on his assessment of their articulateness and demeanor—factors [a court] is not in a position to second-guess."

*Lord*, 184 F.3d at 1095, fn. 8 (internal citations omitted).

---

Transcript shows only that a pretrial conference was held on April 30, 2001. (CT 62).

**18.** During opening statement, Stein stated as follows: "You will hear that his employer, the manager of the plant, went to a notary on August 25th of the year 2000 and gave a statement saying my client was at work between the hours of 7:00 a.m. and 3:30 p.m. in the city of Rancho Cucamonga on July 5th, 2000 and has filed documentation to prove that.

[¶] Mr. Howard [sic] will further go on to tell you that, if my client had left early, the entire line would be shut down and Steve Finley, who you will also hear from, who runs the line, would have notified him." (2 RT 199.)

**1188**

Second, Stein failed to call Howards to testify, despite the fact that Howards' testimony would have been far more helpful than the testimony of the alibi witness that Stein did call. Although "[f]ew decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial," *id.* at 1095, Stein offered no strategic reason for failing to call Howards, especially given the fact that he promised the jury in opening statement that Howards would testify. *See Alcala,* 334 F.3d at 872 ("Although trial counsel's lack of recollection as to why he did not present this evidence does not, in and of itself, rebut the presumption that counsel acted reasonably, neither does it compel [the Court] to conclude that his actions were reasonable where all of the record evidence suggests otherwise.") (internal citations omitted).

Respondent argues that "it would have been reasonable" for Stein to decide to call Finley to testify, rather than Howards, because Finley was Petitioner's direct floor supervisor, while Howards was the plant manager. (Resp't Br. at 8.) However, there is no evidence in the record that this was in fact Stein's reason for failing to call Howards to testify.[19] As discussed earlier, the Court may not "assume facts not in the record in order to manufacture a reasonable strategic decision for [Petitioner's] trial counsel." *Alcala,* 334 F.3d at 871. Respondent's suggestion that Stein's failure to call Howards was motivated by strategic considerations "resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of

[Stein's] deliberations...." *Wiggins v. Smith,* 539 U.S. 510, 526–527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Accordingly, the Court agrees with Petitioner that Stein's failure to interview and call Robert Howards as a witness constituted deficient performance.

■■■ The Court also finds that Petitioner has shown that he was prejudiced by this failure, particularly after Stein informed the jury that Howards would testify. Howards would have provided Petitioner with a complete alibi for the crime and undermined the eyewitness identification placing Petitioner at the scene of the Aguilera shooting, which was the only evidence against Petitioner.

Howards' testimony, unlike the testimony of Steve Finley, whom Stein actually chose to present at Petitioner's trial, was certain and unequivocal. Petitioner was at work at least until 3:00 p.m. on July 5, 2000.[20] (EH 78–79.) At the evidentiary hearing, Howards testified as to his reasons for knowing that Petitioner was present at work at Proactive Packaging until at least 3:00 p.m. on July 5, 2000. Petitioner had been working for Howards since March 1998. (EH 58.) In July 2000, Proactive Packaging employed approximately 15 people. (EH 58.) Howards explained Petitioner's job and interpreted Petitioner's production sheet for July 5, 2000. Petitioner was assigned as a laminating machine operator. (EH 64.) Howards explained that the records for July 5, 2000, showed that Petitioner broke off a production run on the machine at 1:20 p.m.

19. The rationale suggested by Respondent is contradicted by Stein's opening statement in which he stated that *both* Finley and Howards would testify. Furthermore, contrary to Respondent's contention, a defense attorney would reasonably wish to call Howards to testify, instead of Finley, given the disparity between Howards' unequivocal statement that

Petitioner was at work at the time of the shooting and Finley's statement that Petitioner could have left work early.

20. For this reason, the Court finds unpersuasive Respondent's contention that Howards' testimony was merely cumulative of that of witness Steve Finley.

and then began working on another order, pre-folding boxes from 1:50 p.m. until 3:00 p.m., 15 minutes before the shooting occurred. (EH 70–72; Ex. 4.) A production run would not have been broken off in the absence of a supervisor's instructions. (*Id.*) The production sheet was required to be filled out and turned in by the person who operated the machine. (EH 72.)

Further, Howards characterized himself as a "hands on" manager. (EH 66.) He stated that he was on the production floor a couple of times an hour and, if there was a problem, he was there all of the time. (EH 66–67.) He also described a series of controls which governed employee behavior and attendance, including time cards, the production sheets, the small number of employees, termination for leaving a shift early, and direct supervision by Steve Finley. (EH 73–77.) Howards also testified that he brought this production sheet to a court session and gave it to Stein, but that Stein never asked for an explanation and never called him to testify. (EH 80.)

Howards' testimony was important because he was a disinterested third party and had no apparent motive to fabricate an alibi for Petitioner. After hearing Howards' testimony at the evidentiary hearing, the Court notes that Howards would have made a very strong witness on Petitioner's behalf at trial because his testimony was clear, straightforward, and credible. Thus, if he had been called as a witness, Howards' testimony would have provided Petitioner with strong support for his alibi defense and undermined the prosecution's case against him.

Furthermore, because the jury was expecting to hear Howards testify, there was likely a "negative inference" against Petitioner based on Howards' absence. *See Washington v. Smith*, 219 F.3d 620, 634 (7th Cir.2000) (finding that absence of alibi witnesses identified by trial counsel gave the jury "good reason to find Washington's alibi dubious"); *see also Harris v. Reed*, 894 F.2d 871, 879 (7th Cir.1990) (holding that, in light of counsel's failure to interview certain alibi witnesses, his reference to these witnesses in opening argument was "particularly disturbing").

For the reasons noted above, the Court concludes that there is a reasonable likelihood that, if Robert Howards' testimony had been presented to the jury, the outcome of the trial would have been different. It was objectively unreasonable for the California Court of Appeal to find that Petitioner failed to demonstrate ineffective assistance of counsel for Stein's failure to call Howards as a corroborating alibi witness at trial.

**D. Trial Counsel's Failure to Call Victor Madrigal as an Alibi Witness**

 Petitioner also contends that he was denied the effective assistance of counsel by Stein's failure to interview Petitioner's brother, Victor Madrigal, or to call him as a witness to corroborate Petitioner's alibi defense.[21] (Pet'r Br. at 33.) Because there is no reasoned state court decision denying this claim, the Court will assume that the state court decided the

---

**21.** The Court disagrees with Petitioner's argument that Stein failed to adequately interview Victor Madrigal. At the evidentiary hearing, Victor testified that he had spoken on the phone with Stein regarding the fact that he was with Petitioner at work at the time of the shooting. (EH 102–104.) Victor also testified that Stein requested that Victor come to Petitioner's trial to testify. (EH 101). Therefore, because Stein spoke with Victor by telephone, obtained the relevant information from him, and asked him to come to testify, the Court finds that Stein adequately interviewed Victor. However, this does not explain or excuse Stein's failure to call Victor as a witness.

issue and "perform an 'independent review of the record' to ascertain whether the state court decision was objectively unreasonable." *Reynoso*, 462 F.3d at 1109 (quoting *Himes*, 336 F.3d at 853).

At the evidentiary hearing, Victor Madrigal testified that he carpooled with Petitioner every day to work at Proactive Packaging, and that he worked as Petitioner's assistant on the machine that Petitioner operated. (EH 104.) Victor further testified that Petitioner had driven him to work on July 5, 2000, and had driven him home after work, leaving Proactive Packaging around 3:30 p.m. (EH 104.) Victor also testified that he had spoken to Stein briefly by telephone on one occasion prior to Petitioner's trial, but had never spoken with Stein in person. (EH 102.) Victor testified that, when he spoke with Stein on the telephone prior to trial, he told Stein specific details of the events of July 5, 2000: "I told [Stein] the whole day, how it went—[Petitioner] picked me up in the morning, [Petitioner] went to work, the laminator machine had broke [sic] down." (EH 104.)

Victor stated that Stein asked him to testify on Petitioner's behalf, a request to which Victor readily agreed. (EH 101.) However, when Victor came to court to testify at Petitioner's trial, Stein "took [Victor] back outside and told [Victor] you got to leave because you're going to make it bad for your brother." (EH 102.) Victor testified that Stein offered no explanation for why Victor should not testify on Petitioner's behalf, so Victor did as Stein suggested and left the courthouse without testifying. (*Id.*) He did not speak with Stein again. (*Id.*) When questioned at the evidentiary hearing, Stein recalled speaking with Victor, but could not remember any specifics of the conversation, such as whether he asked Victor to testify on Petitioner's behalf. Nor could Stein recall whether he intended to call Victor as a witness at trial. (EH 139–141.)

Respondent contends that there were strategic reasons for Stein's failure to call Victor as a witness at Petitioner's trial, namely that Victor, as Petitioner's brother, was a biased witness, and that Victor would make a poor witness because he was a gang member and on parole. However, the mere fact that Victor was a family member does not render Stein's failure to present his corroboration of Petitioner's alibi harmless. The Ninth Circuit has found prejudicial counsel's failure to investigate and/or present the testimony of family members and loved ones. *See, e.g., Luna v. Cambra*, 306 F.3d 954, 962 (9th Cir.2002) (finding prejudice where defense counsel failed to call petitioner's sister and mother as witnesses to corroborate alibi defense); *Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir.1998) (finding prejudice where trial counsel failed to contact alibi witnesses, including petitioner's sister and girlfriend); *Johnson v. Baldwin*, 114 F.3d 835, 839–840 (9th Cir.1997) (finding prejudice where trial counsel failed to interview petitioner's girlfriend and grandmother because he would have discovered that the alibi was false and elected another trial strategy). Similarly, although Victor is Petitioner's brother and therefore not a disinterested witness, he nevertheless strongly corroborated Petitioner's alibi defense. Victor testified that he was with Petitioner all day on July 5, 2000, and was, in fact, driving home from work with Petitioner around 3:30 p.m., after the shooting had occurred more than 40 miles away.

From Stein's comments to Victor that his presence at court would "make it bad" for Petitioner, it can be inferred that Stein believed Victor would not make a good witness because he was a gang member and had recently been paroled from the California Youth Authority in 1999. (EH

94.) However, that a witness *"might* not ... make the best appearance" at trial is not a reasonable basis for failing to call a witness. *See Avila,* 297 F.3d at 920 (emphasis in original); *see also Black v. Larson,* 45 Fed.Appx. 653, 655 (9th Cir.2002) (unpublished) (holding that defense counsel's failure to interview a witness was unreasonable where it was based only on counsel's belief that the witness "would not make a good appearance because he had been on juvenile probation, had gone to juvenile probation camp, and 'probably looked like a gang member' "). Accordingly, the Court finds that Stein's failure to call Victor Madrigal as an alibi witness constituted deficient performance.

■ The Court also concludes that Petitioner was prejudiced by Stein's failure to call Victor Madrigal as a witness at trial to corroborate Petitioner's alibi. If Stein had presented Victor's testimony that, at the time of the shooting, Petitioner was in Victor's presence, over forty miles away from the scene of the crime, "there is a reasonable probability that ... the result of the proceeding would have been different." [22] *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Despite Victor being Petitioner's brother, Victor's testimony was nevertheless highly corroborative of Petitioner's alibi, and it would have clearly undermined the prosecution's relatively weak case

against Petitioner.[23] Victor's testimony was consistent with Finley's, who was the only alibi witness Stein called at trial. More importantly, it also accounted for Petitioner's whereabouts between 2:30 and 3:30 p.m., the time when Finley testified that he was not certain whether Petitioner was at work. In addition, Victor's testimony would have been mutually corroborative of Howards' testimony that Petitioner was at work until at least 3:00 p.m.

Victor was prepared to testify on Petitioner's behalf at trial, and he even came to the courthouse expecting to testify. This demonstrates that Victor could have been called to testify. Moreover, the testimony given by Victor at the evidentiary hearing was sufficient to establish what his testimony would have been if he had testified at trial. *See Alcala,* 334 F.3d at 872.

Stein informed the jurors that he would prove that Petitioner was at work on the day and at the time of the shooting, but he failed to call the witnesses best able to support that theory, undermining the credibility of Petitioner's entire defense. *See Alcala,* 334. F.3d at 872. Further, the harm to Petitioner arising from Stein's failure to present the testimony of Victor Madrigal, as well as Petitioner himself and Howards, must be viewed in the context of the prosecution's relatively weak case, which depended upon questionable eyewit-

---

**22.** The Court finds unpersuasive Respondent's contention that Petitioner was not prejudiced by the failure to call Victor Madrigal to testify because Victor's testimony was merely cumulative of that of another alibi witness, Steve Finley. (Resp't Reply Br. at 31.) While Finley did in fact testify that Petitioner and his brother usually carpooled to work every day, he had no personal knowledge as to whether they carpooled together on July 5, 2000, the day of the Aguilera shooting. On the other hand, as Victor testified to at the evidentiary hearing, he was driving home from work with his brother around 3:30 p.m. on July 5, 2000, after the shooting occurred.

**23.** Respondent argues that Petitioner was not prejudiced by Stein's failure to call Victor Madrigal as a witness because (1) he was subject to impeachment as he had "multiple juvenile adjudications and was on parole at the time of trial" and (2) as Petitioner's brother, Victor was "obviously biased." (Resp't Reply Br. at 31.) For the reasons discussed in detail above, these facts alone do not preclude a finding of prejudice to Petitioner from Stein's failure to call Petitioner's brother as an alibi witness.

**1192**

ness identification placing Petitioner at the scene of the Aguilera shooting. Therefore, the Court finds that Stein's failure to call Robert Howards and Victor Madrigal as witnesses to corroborate Petitioner's alibi was constitutionally deficient performance that resulted in prejudice to Petitioner. The California Court of Appeal's decision to the contrary is objectively unreasonable. Accordingly, habeas relief is warranted on this claim.

### E. Cumulative Effect of Counsel's Errors

Petitioner also contends that, even if each of the grounds on which Petitioner is seeking relief is not alone sufficient to justify relief, the cumulative effect of these errors is. (Pet'r Br. at 38.) *See Alcala*, 334 F.3d at 893 ("[E]ven if no single error were [sufficiently] prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.'") (quoting *Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir.2002)).

The Ninth Circuit has repeatedly recognized that, in claims of ineffective assistance of counsel, prejudice may result from the cumulative impact of an attorney's multiple deficiencies. *See, e.g., Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir.2005) (quoting *Cooper v. Fitzharris*, 586 F.2d at 1333); *see also Harris ex rel. Ramseyer*, 64 F.3d at 1438–39. "When an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice." *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir.1998). In the context of ineffective assistance of counsel claims, a court must analyze each of a petitioner's claims separately to determine whether his counsel was deficient, but "prejudice may result from the cumulative impact of multiple deficiencies." *Boyde*, 404 F.3d at 1176.

The Court agrees with Petitioner that not only were the multiple deficiencies individually prejudicial, but they also were cumulatively prejudicial. Stein did not just botch one witness or one argument or one issue—he repeatedly demonstrated the lack of diligence required for a vigorous defense.

First, despite his claim to the jury that he would provide proof that Manuel Mendoza, and not his client, was the actual perpetrator, Stein failed to investigate or to present important evidence corroborating Petitioner's third-party culpability defense. Stein did not introduce into evidence, or apparently even listen to, the surreptitiously taped jailhouse conversation between co-defendant Olivares and his girlfriend, in which Olivares makes multiple statements that strongly exculpate Petitioner.

Second, Stein failed to put Petitioner on the stand, after promising the jury in the opening statement that he would do so, to testify that he was at work at the time of the shooting as well as to his knowledge that Manuel Mendoza and Olivares were the actual perpetrators. This not only deprived the jury of hearing Petitioner discuss the basis for his belief that Mendoza was the actual perpetrator, but this broken promise also likely tainted the jury's perception of both Petitioner and Stein.

Finally, Stein presented an inadequate alibi defense by failing both to interview and to call Petitioner's supervisor, Robert Howards, or to call Petitioner's brother, Victor Madrigal. This failure to adequately present an alibi defense is made all the more egregious by the fact that these two witnesses, if called, would have significantly bolstered Petitioner's alibi defense, ac-

counting for the time left open by Finley's testimony.

Given the cumulative effect of these very serious errors committed by Stein, the Court concludes that there is a reasonable probability that, absent the deficiencies, the outcome of Petitioner's trial would have been different. *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. In fact, "the plethora and gravity of [Stein's] deficiencies rendered the proceeding fundamentally unfair." *Harris ex rel. Ramseyer,* 64 F.3d at 1438; *see also Strickland,* 466 U.S. at 696, 104 S.Ct. 2052 (determining that the "ultimate focus of inquiry must be on fundamental fairness of the proceeding whose result is being challenged"). Although each of these errors on its own was sufficiently prejudicial to Petitioner to warrant habeas relief, when viewed in their totality, the cumulative impact of these errors deprived Petitioner of a fundamentally fair trial and severely undermines the Court's confidence in the jury's verdict. Petitioner is entitled to relief on this claim.[24]

## IV. *Brady Claim for the Prosecution's Failure to Produce Exculpatory Evidence*

■■■ Petitioner argues that he was denied the right to due process by the prosecution's alleged failure to disclose certain exculpatory evidence. (Pet. at 6.) More specifically, Petitioner claims that the district attorney was aware, prior to trial, that Petitioner's defense counsel believed Manuel Mendoza to be the actual perpetrator in the Aguilera shooting, but failed to disclose police reports which implicated Mendoza in the murder of Steve "Pollo" Romero. (*Id.*) Petitioner argues that these reports were exculpatory because they would have buttressed Petitioner's third-party culpability defense by showing that Mendoza had a retaliatory motive to shoot Aguilera on July 5, 2000. For the reasons discussed below, the Court finds this claim to be without merit.

A *Brady* violation has three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Evidence " 'known only to police investigators and not to the prosecutor' " is also encompassed by this rule. *Id.* (quoting *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)); *see also Gantt v. Roe,* 389 F.3d 908, 910 n. 3 (9th Cir.2004). However, the intent of the government actor(s) charged with suppressing favorable, material evidence is irrelevant to the *Brady* inquiry. The constitutionally suspect suppression may be either willful or inadvertent. *Strickler,* 527 U.S. at 282, 119 S.Ct. 1936; *see also Gantt,* 389 F.3d at 912 ("*Brady* has no good faith or inadvertence defense.").

■■■ A successful *Brady* claim requires a showing that the suppressed evidence was both favorable to the accused and

---

**24.** Petitioner also argues that defense counsel provided ineffective assistance by failing to investigate evidence that Manuel Mendoza was the actual perpetrator. (Pet. at 5.) Petitioner specifically claims that Stein provided ineffective assistance by failing to present evidence at trial that Manuel Mendoza: (1) was subsequently arrested in possession of the gun used in the Aguilera shooting; (2) had a spe-

cific motive to commit the Aguilera shooting; and (3) had committed other gang shootings in the same time frame as the Aguilera shooting. (*Id.*)

Because the Court finds Petitioner's other IAC claims to be meritorious, *see supra* sections III.A.—III.E., the Court declines to address this IAC claim or to determine whether it would independently warrant habeas relief.

material, in the sense that there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see also Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). *Brady* analysis is by its nature retrospective. *United States v. Coppa,* 267 F.3d 132, 140 (2d Cir.2001) ("[U]nder *Brady* ... the scope of the government's constitutional duty—and concomitantly, the scope of a defendant's constitutional right—is ultimately defined retrospectively, by reference to the likely effect that the suppression of particular evidence had on the outcome of the trial."); *United States v. Hayes,* 376 F.Supp.2d 736, 739 (E.D.Mich.2005) ("The typical *Brady* issue is retrospective, that is, the court examines the materiality of the non-disclosed evidence in the context of a completed criminal trial which has resulted in a verdict of guilty, to assess the probable effect of the evidence on the verdict.").

As discussed above, the Aguilera shooting apparently was triggered by the murder of Marianna gang member Steve "Pollo" Romero on May 27, 2000, and the subsequent murder of Ford gang member Marcos "Fat Boy" Torres on June 29, 2000. Aguilera's shooting followed six days later. The records filed under seal with the Court by the Los Angeles County Sheriff's Department regarding the investigation of the May 27, 2000, murder of Steve Romero indicate that Manuel Mendoza was considered a suspect. (EH, Ex. 13.)

Petitioner contends that the prosecution had a duty to disclose these records once Stein informed the prosecution that he was pursuing a third-party culpability defense that Mendoza was the actual perpetrator in the Aguilera shooting. (Pet'r Br. at 37.)

Petitioner argues that Mendoza's involvement in the Romero murder provided Mendoza with a motive to shoot Ricardo Aguilera on July 5, 2000, that is, to "atone" for the murder of fellow Ford gang member Marcos Torres, which was committed in retaliation for Mendoza's alleged involvement in the murder of Marianna gang member Steve Romero. Therefore, according to Petitioner, the police records of the Romero murder investigation are exculpatory material that should have been disclosed by the prosecution under *Brady.*

Petitioner's *Brady* claim fails because he has not proven the first *Brady* element, i.e., that evidence of Manuel Mendoza's involvement in the Steve Romero murder contained in the Los Angeles County Sheriff's Department reports was exculpatory. The Court finds that the connection between Mendoza's alleged involvement in the Steve Romero murder, which in turn led to the retaliatory murder of Marcos Torres, which then led to the retaliatory attempted murder of Ricardo Aguilera is too attenuated to be exculpatory. Even if the prosecution improperly withheld police reports of Manuel Mendoza's other gang activity, such as his involvement in the murder of Steve Romero, this information is not necessarily exculpatory to Petitioner. All that disclosure of this information would have shown is that Mendoza was involved in Ford gang activity, possibly including the murder of Steve Romero, but it would not have demonstrated that Mendoza was guilty (and Petitioner innocent) of the Ricardo Aguilera shooting.

█ Second, Petitioner has failed to establish that the prosecution withheld any evidence at all, let alone favorable evidence. Petitioner cannot establish a *Brady* violation because the information allegedly withheld was already known to defense counsel at the time of trial—the suspicion that Mendoza was the actual

perpetrator of the Aguilera shooting. The Court is therefore not convinced that the prosecution concealed this information from Petitioner.

██ Finally, the Court also finds that Petitioner has not satisfied the materiality element of a *Brady* violation. Petitioner has failed to establish that disclosure of the police reports regarding the investigation of the Steve Romero murder alone would have "put the case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley,* 514 U.S. 419, 433–435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). In other words, it cannot be said that the result of the proceeding would have been different had defense counsel presented this evidence at trial.

██ Even if disclosed by the prosecution, it is doubtful that the police reports of the Romero murder would have been admitted at Petitioner's trial. Under California law, evidence of Mendoza's prior criminal history or conduct contained in police reports would likely have been inadmissible hearsay. *People v. Adams,* 115 Cal. App.4th 243, 253, 9 Cal.Rptr.3d 170 (2004); Cal. Evid.Code §§ 1101, 1271. Further, inadmissible hearsay cannot form the basis of a third-party culpability defense. *Adams,* 115 Cal.App.4th at 253, 9 Cal. Rptr.3d 170. Also, the police reports would likely have been excluded because third-party culpability evidence must include direct or circumstantial evidence linking the third party to the actual perpetration of the crime. *People v. Geier,* 41 Cal.4th 555, 582, 61 Cal.Rptr.3d 580, 161 P.3d 104 (2007). Mere motive or opportunity to commit the crime is insufficient. *Id.* Because Petitioner did not produce any independent third-party culpability evidence at trial that Manuel Mendoza was the actual perpetrator of the Aguilera shooting, the police reports of the Steve Romero murder would likely have been inadmissible at Petitioner's criminal trial.

Therefore, because Petitioner has failed to state a viable *Brady* violation, the California Supreme Court's denial of habeas relief based upon Petitioner's *Brady* claim was not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. Nor was such denial an unreasonable determination of the facts. Accordingly, habeas corpus relief is not warranted on this claim.

## V. *Conclusion*

For the reasons stated above, it is recommended that a conditional writ of habeas corpus be **GRANTED,** requiring Petitioner be brought to retrial within sixty (60) days of the date the judgment herein becomes final or alternatively be discharged from the adverse consequences of the conviction and judgment in this case.

Dated: July 15, 2009.