Benjamin H. HARRIS, III, By and Through Judith H. RAMSEYER, Guardian ad Litem, Petitioner–Appellee,

v.

Tana WOOD, Superintendent, Washington State Penitentiary, Respondent–Appellant.

No. 94–99002.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 7, 1995.

Decided Sept. 12, 1995.

**1434**

Thorton Wilson, Thomas J. Young, Assistant Attorneys General, Olympia, WA, for respondent-appellant.

Allen M. Ressler, Kany M. Levine, Browne & Ressler, Seattle, WA, for petitioner-appellee.

Before: WRIGHT, BEEZER and HAWKINS, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

Because Benjamin Harris was deprived of his Sixth Amendment right to effective assistance of counsel, we hold that the district court properly granted his petition for a writ of habeas corpus. His defense counsel's many deficiencies cumulatively prejudiced the defense.

■ The court granted Benjamin Harris's petition for a writ of habeas corpus for relief from his conviction for aggravated first degree murder and death sentence. The state appeals only the grant of relief from conviction. We have jurisdiction pursuant to 28 U.S.C. §§ 1291, 2253.[1] We affirm.

**I**

We summarize the factual and procedural background, which is set out in more detail in *Harris ex rel. Ramseyer v. Blodgett,* 853 F.Supp. 1239, 1248–51 (W.D.Wash.1994).

**A. State Proceedings**

In the early morning of June 14, 1984, Jimmie Turner's body was discovered. That same day, Harris asked the police if they had heard rumors that he was involved in the crime. On July 2, he told the police that he was with his girlfriend when Turner was killed. Sixteen days later, he told the police that he and Gregory Lee Bonds were driving around Turner's neighborhood when Turner was killed. Ray Meeks, an acquaintance of Harris and Bonds, gave a written statement to the police that implicated Harris.

On July 19, after being advised of his constitutional rights, Harris again told police that he was with Bonds in Turner's neighborhood when Turner was killed. He added that Bonds told him that Bonds had shot Turner in the neck and the head.

On July 27, Bonds was charged with aggravated first degree murder. Harris took two polygraph examinations and was then arrested. An amended information was filed on August 10, charging Harris and Bonds with aggravated first degree murder.[2] The alleged aggravating circumstance was a contract to have Turner killed.

On August 13, Harris requested an attorney, and the court appointed Murray Anderson. From August 13 to October 22,

---

1. Because Harris is incompetent, his guardian ad litem has standing to litigate the petition on his behalf. *See Wells ex rel. Kehne v. Arave,* 18 F.3d 656, 658 (9th Cir.1994).

2. Harris and Bonds were tried separately. Bonds was acquitted. *See Harris,* 853 F.Supp. at 1250.

Anderson prepared for trial. According to Anderson's billing statements, he consulted with Harris for less than two hours.

Although police reports listed approximately 32 persons with knowledge of the murder and Harris told him of others, Anderson interviewed only three witnesses. He did not request an investigator to help interview witnesses.

Anderson did not obtain an independent evaluation of either the ballistic or the forensic evidence. He moved for a mental examination of Harris. Western State Hospital staff members concluded that Harris was competent to stand trial and was able to perceive the nature and quality of his act. Anderson then moved for a mental examination of Harris by an independent expert. Although the court granted the motion, Harris was not examined before trial.

On October 22, upon Anderson's advice, Harris gave a statement to the prosecutors. He admitted that he was present at the time of the homicide, that Bonds fired the initial shot, and that he himself fired the second shot. He denied that he agreed to pay Bonds to kill Turner. Trial began on that day.

On October 26, Meeks testified that Harris offered Bonds a contract to kill Turner and that Bonds accepted. Harris testified that both he and Bonds shot Turner, but denied that he offered Bonds a contract to kill Turner.

The jury returned a guilty verdict of aggravated first degree murder. From 1986 to 1993, Harris unsuccessfully sought direct and collateral relief in Washington state courts.

### B. Federal Proceedings

In March 1994, Harris successfully petitioned for habeas relief in district court. That court ordered his conviction vacated, finding that he was deprived of effective assistance of counsel and due process. It provided an extensive review of Anderson's performance. The state appeals.

### II

### A. Legal Standards

 We review de novo the grant of habeas corpus relief. *Sanders v. Ratelle,* 21 F.3d 1446, 1451 (9th Cir.1994). And we review de novo a claim of ineffective assistance of counsel, which is a mixed question of law and fact. *Id.* Such a claim requires a two-part inquiry. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

 First, we decide whether Anderson's performance was deficient. *Id.* The question is whether "counsel's representation fell below an objective standard of reasonableness ... considering all the circumstances ... under prevailing professional norms." *Id.* at 688, 104 S.Ct. at 2065. In answering this question, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id.* at 689, 104 S.Ct. at 2065.

 Second, we decide whether the deficient performance prejudiced the defense. *Id.* at 687, 104 S.Ct. at 2064. The question is whether "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068.

This case involves many alleged instances of ineffective assistance of counsel. First, we treat briefly the eight instances of Anderson's deficient performance that the state does not dispute on appeal. These are relevant to the subsequent discussion of cumulative prejudice. We then address instances of Anderson's deficient performance that the state argues were not deficient. Finally, we explain how the deficiencies cumulatively prejudiced Harris's defense.

### B. Undisputed Deficiencies

The state does not challenge the district court's conclusion that Anderson did not thoroughly investigate facts surrounding the charge and possible defenses, and that he failed to prepare adequately for trial. Anderson did not obtain an expert to prepare a social history, did not retain an investigator to interview witnesses, and interviewed only three of the 32 persons in the police reports (19 of whom testified at the guilt phase). *Harris,* 853 F.Supp. at 1256. Also, although

Harris provided Anderson with names of persons who may have had knowledge of the murder, Anderson did not attempt to reach any of them. Finally, he did not obtain an independent evaluation of the ballistic evidence or the forensic evidence and spent considerably less time and effort in investigation and preparation than did counsel for codefendant Bonds. *Id.* at 1256–57.

The state does not challenge the district court's conclusion that Anderson failed to consult adequately with Harris and to inform him fully on important issues and decisions regarding his defense. Anderson's billing statement showed that he spent a total of one hour and 48 minutes consulting with Harris before trial. *Id.* at 1258.

The state does not challenge the district court's conclusion that Anderson failed to investigate Harris's mental and emotional status, including capacity to commit the crime and competence to stand trial. While Anderson was aware of Harris's history of emotional problems, he did not attempt to locate Harris's educational and medical records. *Id.* at 1260. Also, although Anderson obtained an order allowing an independent psychological evaluation, he failed to obtain an expert or to have Harris further evaluated until post trial proceedings. *Id.* Finally, because Anderson believed that Harris was competent, he failed to give the evaluating team at the hospital letters Harris had written. *Id.* These indicated that Harris was delusional. *Id.*

The state does not challenge the district court's conclusion that Anderson should have challenged the admissibility at trial of Harris's oral and written statements given to police officers made before October 22, 1984, regarding the events surrounding the murder.

The state does not challenge the district court's conclusion that Anderson failed to conduct proper voir dire of prospective jurors. Anderson was absent during part of the voir dire, leaving an inexperienced and unprepared associate to conduct it. *Id.* at 1265.

The state does not challenge the district court's conclusion that Anderson should have

objected to some items of evidence. Without expressing an opinion as to admissibility, the court explained that Anderson should have objected to the admission of Harris's 1969 prior convictions and testimony regarding a list of persons Harris intended to kill. *Id.*

The state does not challenge the district court's conclusion that Anderson failed to propose or object to any jury instructions in the guilt phase. He did not argue the merits of submitting instructions on lesser included offenses. *Id.* at 1266.

Finally, the state does not challenge the district court's conclusion that counsel failed to raise or preserve meritorious issues in appellate proceedings. Anderson should have advised the court that the strongest ground for appeal may be ineffective assistance of counsel. *Id.* at 1271. Also, Anderson failed to correct several inaccuracies in the trial court's report to the Washington Supreme Court. *Id.*

**C. Disputed Deficiencies**

We address here only those disputed deficiencies that we find to have been clearly below an objective standard of reasonableness.

**1. Advice to make statement to prosecutor**

■ The state challenges the district court's conclusion that Anderson's advice to Harris to give a statement to the prosecutors was deficient. We find that Anderson's advice fell below an objective standard of reasonableness and was deficient.

Anderson initiated discussions with the prosecutors, believing that if Harris made a statement, there might be a reduction in the charge. He thought that this method was "unconventional, but it could be done." He speculated that if Harris himself had been involved in the shooting, he might have a defense to the aggravating circumstance. But his preliminary discussion with Prosecuting Attorney Griffies and Deputy Prosecutor Felnagle revealed that the prosecutors could not promise to reduce the charges:

> ANDERSON: My understanding is Mr. Harris is going to make a statement of his own free will.

FELNAGLE: Thank you. There have been no promises made between our office and you. We're not saying that we're going to do anything as a result of this statement. We're here, we're going to listen to his statement, and evaluate it thereafter. Further, it is my understanding that anything he does say here would be admissible in court at a later time if we come to that juncture. Is that your understanding as to what we're doing here?

ANDERSON: No. My understanding as to why we are here is if this statement meets the requirements at this time the charge would be reduced to murder in the first degree rather than aggravated murder. On that basis he is making this statement.

FELNAGLE: I'm not prepared to indicate anything about a reduction.

ANDERSON: I don't think that reduction has been closed. At any time we offer that it has been told to me that it will be presented to the prosecutor for his consideration.

FELNAGLE: That is correct. Is that a fair statement?

GRIFFIES: Yes, as long as we also understand that the statement he is about to give in and of itself will have no affect [sic] necessarily on any change in the charges as they now stand. We will review the statement and see if at that time for some reason it has merit then we will consider the possibility of a reduction of the charge.

FELNAGLE: Further, there is no offer of immunity. With regard to statements made here, they would in fact be freely admissible in court for any purpose. Has that been fair?

ANDERSON: That is understood.

In spite of this exchange, and with no specific agreement with the prosecutors (that might have been attained by proffer), Anderson allowed Harris to make a statement that supported the charges against him,

including the aggravating circumstance of solicitation for murder. Harris supplied a motive, saying that he believed that Turner had damaged his car and owed him money. He denied solicitation of murder, but said that he assisted Bonds by driving Bonds to Turner, providing a gun and firing a second shot to assure death.[3] Further, Anderson did not attempt to terminate the discussion after he realized that Harris intended to implicate himself in the murder.

### 2. Decision to call Harris to testify

The state challenges the court's conclusion that Anderson's decision to call Harris to testify was deficient. We find that Anderson's decision fell below an objective standard of reasonableness and was deficient.

Although the state argues that Anderson's purpose was to convince the jury to believe Harris and to disbelieve Meeks, that argument is not supported by the record. Anderson did not characterize his purpose as such:

The reason I called him as a witness was because he had made the statement, and ... I believed that the jury had better hear it from Mr. Harris rather than on some readout from the prosecutorial side.

Even if Anderson's purpose was to build Harris's credibility, he failed. On direct examination before the jury, he did not question Harris about the contract; inexplicably, he examined Harris about the contract *outside* the presence of the jury. And he did not conduct a redirect examination or attempt to rehabilitate Harris's credibility.

### 3. Closing Argument

Finally, the state challenges the court's conclusion that Anderson's closing argument was deficient. We find that the closing argument fell below an objective standard of reasonableness and was deficient.

Although the state describes the argument as simply attacking Meeks's credibility and "not bolstering Harris's veracity," the record reveals that the argument affirmatively attacked Harris's credibility and even his humanity. Anderson repeatedly told the jury

---

**3.** Anderson was apparently unaware that, based on the forensic evidence, it was implausible that Harris fired the second shot.

that Harris was a liar. He told them that Harris was a thief. He said that Harris had had "in's [sic] and out's [sic] with several young women" and that "he drank intoxicating liquor a great deal." He also said that Harris was "a man who doesn't have the same moral code as we expect." He explained that Harris belonged to "a class of men who don't work" and "carry guns, regularly." He further explained that these men have a peculiar sense of honor that "has to do with coming down on another member of their society with overwhelming force" and that "[t]hey kill people."

The closing argument left the jury little reason to believe Harris's testimony, including his denial of the existence of the contract. It also left the jury little reason to empathize with Harris. As the district court found, "these arguments were beyond any discernible trial strategy, and were outrageous. They did not support a reasonable defense theory...." *Harris,* 853 F.Supp. at 1267–68; *cf. Bonin v. Calderon,* 59 F.3d 815, 831 (9th Cir.1995) (in closing argument, attorney emphasized mitigation theory and attempted to humanize the defendant).

### D. Cumulative Prejudice

▆▆▆▆ Harris argues that the cumulative impact of Anderson's deficiencies prejudiced his defense. In addition to finding prejudice from individual deficiencies, the district court concluded that the deficiencies it found were cumulatively prejudicial. *Harris,* 853 F.Supp. at 1274. We have previously recognized that "prejudice may result from the cumulative impact of multiple deficiencies." *Cooper v. Fitzharris,* 586 F.2d 1325, 1333 (9th Cir.1978) (en banc), *cert. denied,* 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979).

We have found prejudice resulting from cumulative errors only once in the post-*Strickland* era.[4] In *Mak v. Blodgett,* 970 F.2d 614 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1363, 122 L.Ed.2d 742 (1993), the cumulative errors included counsel's failure to present mitigating evidence in the

penalty phase. *Id.* at 622. They also included the court's refusal to admit exculpatory evidence and its failure to instruct the jury properly in the penalty phase. *Id.* at 624–25.

Anderson's deficiencies in the guilt phase of Harris's trial were numerous. They included:

(1) failure to investigate and prepare adequately for trial;

(2) failure to consult adequately with Harris;

(3) failure to investigate adequately Harris's mental and emotional status;

(4) failure to challenge the admissibility of Harris's statements made before October 22, 1984, regarding the events of the murder;

(5) failure to conduct proper voir dire;

(6) failure to object to evidence;

(7) failure to propose, or except to, jury instructions;

(8) failure to raise or preserve meritorious issues in appellate proceedings;

(9) advice to make statement to prosecutor;

(10) decision to call Harris to testify at trial; and

(11) closing argument in the guilt phase.

The number of errors that tainted Harris's defense far exceeds the number that infected the defense in *Mak.* See Rachel A. Van Cleave, *When Is An Error Not An "Error"? Habeas Corpus and Cumulative Error,* 46 Baylor L.Rev. 59, 60 (1993) (cumulative error analysis entails quantitative analysis). And as revealed in our discussion of the deficiencies, they are serious errors. We do not hesitate to conclude that there is a reasonable probability that, absent the deficiencies, the outcome of the trial might well have been different. *See Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068. Indeed, the plethora and gravity of Anderson's deficiencies rendered the proceeding fundamentally unfair. *See id.* at 696, 104 S.Ct. at 2069 ("ultimate focus of inquiry must be on fundamental fairness of

---

4. *Strickland,* 466 U.S. 668, 104 S.Ct. 2052. Given the different standards of prejudice that governed in the pre- and post-*Strickland* eras, we do not compare the cumulative errors resulting in

prejudice in pre-*Strickland* cases to those in the instant case. *See United States v. Tucker,* 716 F.2d 576, 595 (9th Cir.1983); *Ewing v. Williams,* 596 F.2d 391, 395 (9th Cir.1979).

the proceeding whose result is being challenged").

By finding cumulative prejudice, we obviate the need to analyze the individual prejudicial effect of each deficiency. *See Mak,* 970 F.2d at 622 ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel affirmance...."). But by no means do we rule out that some of the deficiencies were individually prejudicial.

### III

Anderson's performance was deficient in eleven ways, eight of them undisputed. We are compelled to find that they cumulatively prejudiced Harris's defense. The court properly granted habeas relief.

**AFFIRMED.**