# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-10127

United States Court of Appeals
Fifth Circuit

**FILED**

May 1, 2015

Lyle W. Cayce
Clerk

KIRA DODSON,

        Petitioner - Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

        Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:12-CV-918

Before STEWART, Chief Judge, and KING and ELROD, Circuit Judges.

KING, Circuit Judge:*

        Petitioner–Appellant Kira Dodson was convicted by a jury of the capital murder of her 18-month old daughter, Kaylynn, and was sentenced to an automatic term of life imprisonment. Dodson now appeals the district court's denial of her petition for a writ of habeas corpus. Dodson's habeas petition was premised on her claim that she was denied the constitutional right of effective

---

    * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

assistance of counsel during her state trial. For the following reasons, we AFFIRM the judgment of the district court.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Kaylynn Velasquez was born in October 2003. In August 2003, Dodson's older son, Abraham, was placed in the home of Jessica Edwards, a Hunt County prosecutor and a foster parent. Abraham stayed with Edwards and her husband until May 2004, and then was returned to Dodson. On March 7, 2005, Dodson called Edwards and said she could not handle two children anymore and told Edwards that if she wanted Abraham, she would allow Edwards to adopt him. Dodson's parental rights to Abraham were terminated based on voluntary relinquishment on March 17, 2005. On March 18, 2005, Edwards heard Dodson arguing with her mother over the telephone; Dodson told Edwards that her mother was coming to take her cell phone away because she was angry that Dodson had given Abraham to Edwards. Dodson also said she would give Kaylynn to Edwards, but she "didn't want people thinking bad of me for giving my kids up."

On March 24, 2005, which was about two weeks before Kaylynn's death, Michael Erwin, Dodson's boyfriend, awoke at 2:30 a.m. to hear Dodson screaming that there was something wrong with Kaylynn. When Erwin entered Kaylynn's bedroom, he saw Kaylynn lying "halfway off" the bed; she was a "'bluish-purple'" color, and her head was facing the foot of the bed. Erwin called 911, and, following the instructions of the 911 operator, Erwin pushed on Kaylynn's stomach. After Erwin pushed on Kaylynn's stomach, she began to gasp and started to cry. Once the paramedics arrived, they transported Kaylynn to the hospital, and several hours later, they returned home. Dr. Nicole Hernandez, Kaylynn's emergency room physician on March 24, 2005, testified that she was told that Kaylynn had stopped breathing and had turned blue. Dr. Hernandez testified that Kaylynn had a runny nose, but appeared

happy and playful. Dr. Hernandez ordered several tests, including a respiratory syncitial virus test, a flu test, and a chest x-ray; however, each of the tests was negative. Dr. Hernandez sent Kaylynn home with a cough medicine and an antibiotic to address her common cold and ear infection. Dr. Hernandez testified that she saw no reason why Kaylynn would have died two weeks later.

Erwin testified that on the evening before Kaylynn's death, he, Dodson, and Kaylynn ate dinner together. Erwin further testified that Dodson put Kaylynn to bed after dinner, as was their normal routine. Shortly thereafter, Erwin and Dodson went to bed. Sometime between the hours of 7:00 and 8:00 a.m. on April 7, 2005, Erwin awoke. Dodson was lying in bed next to him getting ready to smoke a cigarette. Dodson said to Erwin, "something don't feel right." Dodson went to check on Kaylynn, after which, Erwin heard screaming. Erwin went to see what was wrong, and found Dodson holding Kaylynn in a blanket. Dodson called 911 and spoke to the operator. Paramedics arrived and declared that Kaylynn was dead. Erwin testified that Kaylynn was a normal, healthy, and happy baby the day before she died.

On cross-examination, Dodson's trial counsel, Paul Johnson, and Erwin engaged in the following exchange:

Q. I know you didn't want to see Kira in trouble, sir, but I bet it would be a fair statement to say that you dern [sic] sure didn't want yourself in trouble.

A. I wasn't going to be in trouble, anyway. I hadn't done anything wrong.

Q. But the police are telling you that there's evidence that somebody did something wrong, isn't there?

A. Yeah, I even volunteered to take a lie detecter [sic] test right then and there. We can take one now.

No. 14-10127

Later, Johnson asked Erwin whether Sergeant Rich ever asked him anything "that might have made you think that he might have thought that you could possibly be involved?" Erwin replied, "[h]e asked me if I was willing to take a lie detector test or anything, if it was possible, and I told him, yeah, we could take it right then." Johnson did not object to either of Erwin's references to a lie detector test during the cross-examination.

Dr. Larry Pettit, the doctor who saw Kaylynn the day she died, also testified at Dodson's trial. He testified that Kaylynn was deceased when she arrived at the hospital on April 7, 2005, having been dead for a minimum of three hours. Dr. Pettit did not see any obvious signs of external trauma. Dr. Pettit further testified that because Kaylynn was 18-months old at the time of her death, she did not die from sudden infant death syndrome ("SIDS").

After Kaylynn died, Dodson told Edwards that the police were "mean" to her and were "trying to pin this on me." Dodson also asked Edwards what the police looked for "in autopsies on babies that die of SIDS?" Dodson further asked "what the difference was between the autopsies of a baby who suffocated and one who died of SIDS."

On the morning of Kaylynn's death, Detective Kimberly Mayfield and Sergeant Fred Rich, Mayfield's supervisor, went to the hospital to investigate Kaylynn's death. Erwin told Mayfield that two weeks before Kaylynn's death, Kaylynn had stopped breathing. Mayfield also talked with the responding officer, an emergency room physician, and Dodson. Dodson never mentioned that two weeks earlier, Kaylynn had been transported to the hospital after she had stopped breathing. On April 21, 2005, Mayfield met Dodson and Erwin at police headquarters for them to write out affidavits, which were routinely requested in child death cases. Because Kaylynn had stopped breathing two weeks before she died, Mayfield and Rich were suspicious that someone might have smothered Kaylynn. Mayfield interviewed Dodson in a room separate

4

from where Rich interviewed Erwin. After Dodson made corrections to her initial statement and signed it, she went to the waiting area. While there, she called Erwin, who was still writing his statement, and asked where he was and what was taking him so long. Once Erwin finished his statement, Rich took Dodson into an interview room.

Mayfield, who observed Rich talk with Dodson, testified that she did not see Rich threaten, yell at, or accuse Dodson of murdering Kaylynn. Mayfield saw Rich leave the room and when Rich returned to the room, Dodson said she trusted him and wanted to tell him something, but she did not want Erwin to know. Dodson told Rich that she wanted Erwin to leave first and that after Erwin left, she would tell Rich something. Rich left the room again and then returned and gave Dodson a Miranda warning. Dodson then wrote a voluntary statement. Dodson's voluntary statement, which was read to the jury, provided, inter alia, that: (1) "I sent [Kaylynn] to a better place away from the hurt and put-outs that my family and everyone else had to offer my children," (2) "I physically didn't mean to hurt Kaylynn, I just placed the pillow over her face in her sleep and held it down and hated myself every minute," and (3) "I just felt like this was Kaylynn's only peaceful way out." Dodson was arrested and taken to jail after she signed the statement.

Rich testified that he never raised his voice while interviewing Dodson; rather, Dodson volunteered that she put a pillow over Kaylynn's face. Rich further testified that during his interview with Erwin, Rich told Erwin there was a possibility Kaylynn was suffocated to see how Erwin would react. He testified that he never directly accused Dodson of killing Kaylynn when talking to Erwin and further testified that he had never received a false confession but that he did believe that some individuals made false confessions to obtain notoriety. During the prosecution's direct examination of Rich, the following exchange occurred:

Q. So you have this conversation with her. At some point in time does the defendant say something which causes you to change your opinion about how the course of the conversation is going?

A. I asked her - - one of the questions I asked, I had asked Michael Erwin, too, is because I wanted to get a response from her. I asked her if she would take a polygraph concerning if the child had been smothered.

Johnson immediately objected, and the court sustained the objection. Johnson also asked the court to instruct the jurors to disregard Sergeant Rich's comment. The court complied by instructing the jury to disregard Rich's comment because polygraph examinations were not admissible in Texas as they had not been deemed reliable. Finally, Johnson asked the court to declare a mistrial; however, the court denied Johnson's request.

Dr. Joni McClain performed an autopsy on Kaylynn and testified that there were no external injuries to Kaylynn's body and that Kaylynn was a well-developed, well-nourished, and healthy child. An internal exam revealed a few "petechiae," or pinpoint hemorrhages in the thymus gland; petechiae are a nonspecific finding but can be consistent with an asphyxial death. Dr. McClain found some swelling of the brain, which is consistent with, but not necessarily diagnostic of, a suffocation-type death. There was no evidence of an infection or asthma, and the toxicology results were negative. Dr. McClain testified that SIDS was not applicable because Kaylynn was 18-months old. McClain determined that the cause of death was suffocation and the manner of death was homicide, but McClain also testified that had there not been a confession, the cause and manner of death would have been listed as "undetermined."

Dr. Christian Meissner, an assistant professor of psychology and criminal justice, testified on Dodson's behalf as an expert on false confessions. According to Meissner, interrogation techniques that lead to gaining a true confession from a guilty person may also lead to an innocent person giving a

false confession.  Several factors that may determine whether an individual gives a false confession include the suspect's age, the length of time the suspect is interrogated, and whether the interrogation takes place in the middle of the day as opposed to the middle of the night.  Meissner also testified that he was an academic and had no experience in conducting law enforcement investigations; he could not tell the jury whether Dodson's confession was true or false.

Dodson testified that she did not kill Kaylynn and that Rich coerced her into writing a false confession.  She testified that on the morning that she discovered that Kaylynn had died, she was awakened by Erwin's cell phone after 7:00 a.m.  According to Dodson, while Erwin was in the bathroom, Dodson had an "'eerie feeling,'" and Erwin told her to check on Kaylynn.  Dodson testified that she ran to Kaylynn's room and found her lying on the bed with a baby blanket "'halfway'" on her face.  Dodson claimed that she tried to wake her, but Kaylynn did not wake up.  Dodson testified that she called 911, and the operator told Dodson to place Kaylynn on a hard surface and do CPR, but Kaylynn appeared to be dead even before Dodson picked her up from the bed.  Dodson claimed that, once at the hospital, she was told by a nurse that SIDS could have caused Kaylynn's death.

Dodson further testified that on April 21, 2005, the day that Dodson and Erwin went to the police station to give their written statements, they were put in separate rooms, and she was asked to describe the events of the two days before she found Kaylynn dead.  According to Dodson, Mayfield said she could go back to the waiting room after she was finished.  Dodson testified that when she asked Mayfield about the autopsy results, Mayfield said her supervisor would be out to talk to Dodson.  Dodson contends that she waited for Erwin to finish and then called Erwin's cell phone to ask what was taking him so long, and Erwin said he was almost done.  After she hung up, Rich came to the

waiting area and took Dodson to an interview room. Dodson testified that she thought he was going to return Kaylynn's blanket and pillow and go over the autopsy report, but Rich acted angry, slammed his hand on the table, and raised his voice at times. Dodson claims that Rich repeatedly said, "[D]on't you want to tell me?" and that he knew Kaylynn had been suffocated because he had read the autopsy report. Dodson testified that Rich said he knew Dodson "did it." She further testified that while he talked to her, Rich would stand over her at times and at times he would sit down. Dodson also testified that after about thirty minutes, she wrote out the confession because she was forced to write it. Finally, Dodson testified that her written confession contained "lies" because Rich made her believe she had killed Kaylynn.

During the State's cross-examination of Dodson, the prosecutor asked Dodson whether she had been corresponding by mail with Charlie Wiggins. Dodson replied that she had and that she loved him very much. The State then introduced into evidence, without objection, a cartoon/greeting card (the "Cartoon") depicting a couple holding hands and containing the caption "love is . . . dreaming of starting a family." Johnson started to object when the prosecutor began to question Dodson regarding the contents of a letter to Wiggins that was not introduced into evidence, but the court did not rule on his objection. Shortly thereafter, Dodson answered affirmatively when asked whether Wiggins was an inmate. The prosecutor asked Dodson whether she wanted to be a mother again, and she said "If I have the chance to be." Johnson then objected when the prosecutor attempted to further explore her answer, and the court sustained the objection.

During summation, Johnson argued that he anticipated that the prosecutor would argue that it was coldhearted for someone who had just murdered a child to send a letter saying, "Love is a dream of starting a family," to a boyfriend or a lover in jail. The prosecutor responded that children are

No. 14-10127

disposable to Dodson, whether by adoption or murder; that she has no intention of stopping; that she wrote a letter to an inmate and wants to have his child; and that it was the jury's responsibility not to let that happen

The jury deliberated for three days, and sent two notes stating that it was hopelessly deadlocked, before returning its guilty verdict. On April 25, 2007, the jury found Dodson guilty of capital murder. The Texas Court of Appeals affirmed Dodson's conviction. *Dodson v. State*, No. 05-07-00649-CR, 2008 WL 625115, at *1 (Tex. App.—Dallas Mar. 10, 2008, pet. ref'd). The Texas Court of Criminal Appeals (the "TCCA") denied discretionary review. *See id.* Dodson's original state habeas counsel, Jani Maselli, filed a "skeleton" state habeas application on her behalf. *See Ex parte Dodson*, No. WR-73466-01, 2010 WL 1077998, at *1 n.1 (Tex. Crim. App. March 24, 2010). Dodson's subsequent habeas counsel, Randy Schaffer, then filed an amended and a second amended state habeas application, alleging claims of ineffective assistance of trial and appellate counsel.

The TCCA remanded Dodson's application to the trial court for factual development. *See id.* at *1. After conducting an evidentiary hearing, the state habeas court issued findings of fact and conclusions of law, recommending that state habeas relief be denied. The TCCA denied the application without written order on the findings of the trial court following a hearing.

Dodson next filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Northern District of Texas. Dodson's application alleged that her trial counsel, Paul Johnson, was constitutionally ineffective in six different ways. The magistrate judge ("MJ") issued findings and conclusions and recommended that Dodson's application be denied. The district court accepted the MJ's findings and conclusions, and dismissed Dodson's habeas petition with prejudice. The district court also denied a COA.

No. 14-10127

A judge of this court granted Dodson a COA on the following issues

(1) whether trial counsel rendered ineffective assistance in failing to file a motion in limine to prohibit testimony regarding polygraph examinations and in failing to object to Erwin's testimony regarding a polygraph examination; (2) whether trial counsel rendered ineffective assistance in failing to file a motion in limine to prohibit testimony that Dodson wanted to start a family with an inmate and in failing to obtain a ruling on his trial objection; and (3) whether a cumulative prejudice analysis was required under *Strickland*.

## II.    STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs federal habeas corpus review of state court convictions.  28 U.S.C. § 2254.  Under AEDPA, habeas relief may not be granted by a federal court with respect to a claim that was adjudicated on the merits in state court, unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).  AEDPA "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (internal quotation marks omitted).

As a result of this highly deferential standard of review, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity." *Richter*, 562 U.S. at 101 (internal quotation marks omitted).  "The more general the rule, the more

10

leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (internal quotation marks omitted). This court reviews "the district court's findings of fact for clear error and . . . its conclusions of law *de novo*, applying the same standard of review to the state court's decisions as the district court." *Ortiz v. Quarterman*, 504 F.3d 492, 496 (5th Cir. 2007).

### III.  ANALYSIS

Dodson contends that her state trial counsel, Paul Johnson, was constitutionally ineffective. "The Sixth Amendment guarantees a criminal accused the right to assistance of counsel, and 'the right to counsel is the right to the effective assistance of counsel.'" *Carty v. Thaler*, 583 F.3d 244, 257 (5th Cir. 2009) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order for Dodson to be entitled to relief on her ineffective assistance of counsel claim, she must establish that her trial counsel's performance was deficient and that she suffered prejudice as a result. *Id.* at 687. "To show deficient performance, 'the defendant must show that counsel's representation fell below an objective standard of reasonableness.'" *Reed v. Stephens*, 739 F.3d 753, 773 (5th Cir. 2014) (quoting *Strickland*, 466 U.S. at 688). This court considers counsel's performance "based on prevailing norms of practice, and judicial scrutiny of counsel's performance must be highly deferential to avoid 'the distorting effects of hindsight.'" *Loden v. McCarty*, --- F.3d ---, ---, No. 13-70033, 2015 WL 631400, at *6 (5th Cir. Feb. 13, 2015) (quoting *Carty*, 583 F.3d at 258). "[A] conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Richards v.*

*Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) (internal quotation marks omitted). In order to show prejudice, Dodson must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

Under AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101. "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Id.* at 105 (internal citations and quotation marks omitted). Accordingly, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* at 101. The ultimate question for this court to decide when considering a 28 U.S.C. § 2254 petition is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

Dodson argues that her trial counsel was constitutionally ineffective by failing to file a motion in limine prohibiting testimony regarding polygraph examinations and by failing to object to a witness's testimony regarding a polygraph examination. She further argues that her trial counsel was constitutionally ineffective by failing to file a motion in limine prohibiting testimony regarding Dodson's desire to start a family with an inmate and by failing to obtain a ruling regarding an objection made during this testimony. She also contends that *Strickland v. Washington*, 466 U.S. 668 (1984), requires a cumulative prejudice analysis. We address each issue below.

No. 14-10127

**1. References to polygraph examinations**

The state habeas court found that Johnson admitted at the evidentiary hearing that he did not file a motion in limine concerning the topic of polygraph examinations. The state habeas court also found that Johnson testified that he did not object to Erwin's testimony because he thought an objection would draw the jury's attention to the answer. The state habeas court further found that: (1) "[h]ad a motion in limine been filed, the court would have admonished each witness not to mention the polygraph examination," (2) "even if a motion in limine were filed and granted, an objection would still be required to enforce the motion and preserve error," (3) "it is conceivable that the jury inferred that Dodson was unwilling to take a polygraph examination," (4) "it is conceivable . . . that Dodson's refusal to take a polygraph examination negatively impacted her credibility with the jury," (5) "it is conceivable . . . that the witnesses may have mentioned the polygraph examinations even if a motion in limine was filed," and (6) that it was "reasonable to conclude that a motion in limine would have greatly reduced the likelihood that a polygraph would be mentioned."

The state habeas court nonetheless concluded that Johnson's "decision not to file a motion in limine was a reasonable trial strategy based upon trial counsel's belief that the State would not attempt to adduce testimony concerning polygraph examinations since it is well settled that such testimony is inherently inadmissible." As for Johnson's decision not to object to Erwin's non-responsive testimony regarding his desire to take a polygraph examination during cross-examination, the state habeas court concluded that it was a "reasonable trial strategy based upon trial counsel's belief that an objection would draw the jury's attention to that testimony unnecessarily."

Dodson has failed to establish that the state habeas court's findings were based upon an unreasonable determination of the facts or involved an unreasonable application of clearly established Supreme Court precedent. In

Texas, "[t]he existence and results of a polygraph examination are inadmissible for all purposes." *Tennard v. State*, 802 S.W.2d 678, 683 (Tex. Crim. App. 1990) (en banc). Thus, it was reasonable that Johnson would not anticipate that the prosecution would attempt to offer inadmissible evidence. Given that "an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities," *Richter*, 562 U.S. at 110, it was not unreasonable for the state habeas court to conclude that Johnson's decision not to file a motion in limine was reasonable trial strategy.

Dodson also argues that "counsel had no sound strategic reason not to seek a limine order once Rich mentioned a polygraph examination," to prevent Erwin from mentioning his desire to take a polygraph. But Erwin's testimony regarding a polygraph examination took place during Johnson's cross-examination, a point in the trial where Johnson controlled the questions. It was not unreasonable for Johnson to assume that Erwin would not, in a non-responsive answer during cross-examination, mention his desire to take a polygraph examination. *See Richter*, 562 U.S. at 110 (explaining that while trial counsel was mistaken in thinking that certain testimony would not be presented, it was "at least debatable whether counsel's error was so fundamental as to call the fairness of the trial into doubt").

Additionally, Dodson attacks the state habeas court's conclusion that Johnson's decision not to object to Erwin's non-responsive mention of a polygraph examination was a reasonable trial strategy. We must keep in mind that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Accordingly, this court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged

action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). This court has previously held that "[s]ince an objection may tend to emphasize a particular remark to an otherwise oblivious jury, the effect of objection may be more prejudicial than the original remarks." *Walker v. United States*, 433 F.2d 306, 307 (5th Cir. 1970); *see also Charles v. Thaler*, 629 F.3d 494, 502 (5th Cir. 2011) (explaining that there is "no constitutional rule that counsel must make, or not overlook, every possible objection to unfavorable testimony"). Dodson argues that the state habeas court's conclusion that Johnson's failure to object to Erwin's testimony was reasonable ignores Johnson's other decision to object to Sergeant Rich's testimony regarding a polygraph examination. Nevertheless, it is entirely reasonable to conclude that Johnson decided that an objection to Erwin's testimony would do more harm than good. Johnson's "conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness," *Richards*, 566 F.3d at 564 (internal quotation marks omitted), which is not the case here. Therefore, since the state habeas court's application of *Strickland*'s deficiency prong was reasonable, and its decision was not based on an unreasonable determination of the facts in light of the record before it, the district court was precluded from granting habeas relief. *See Richter*, 562 U.S. at 101. Accordingly, there is no need to address the prejudice prong of the *Strickland* analysis. *See United States v. Gaudet*, 81 F.3d 585, 591 (5th Cir. 1996).

## 2. References to Dodson's desire to start a family

Next, Dodson argues that her trial counsel was constitutionally ineffective by failing to file a motion in limine prohibiting testimony regarding Dodson's desire to start a family with an inmate and by failing to obtain a ruling on an objection he made during this testimony. The state habeas court

No. 14-10127

made the following factual findings: (1) "[t]rial counsel did not file a motion in limine," (2) "[t]rial counsel was given the cartoon in advance of trial," and (3) "[t]rial counsel testified that he did not object to the cartoon at the time it was admitted because he did not perceive of any impropriety." The state habeas court made the following conclusions of law: (1) "[t]he cartoon . . . had no relevance aside from casting Dodson's character in a bad light," (2) "[a]fter the admission of the cartoon, trial counsel was sufficiently concerned about the prejudicial effect of the cartoon to address it at some length in his final argument," (3) "[t]he state fully exploited the prejudicial effect of the cartoon in their final argument by characterizing it as a reason to prohibit Dodson from ever having children again by keeping her incarcerated," (4) "[t]rial counsel was deficient in failing to object to the admissibility of the cartoon,"[1] (5) "the cartoon, in all reasonable probability, would not have affected the jury's verdict," (6) "[a]lthough the cartoon has some prejudicial affect [sic], the notes sent by the jury during deliberation indicate that the jury focused on the medical records and the time of the 911 call," and (7) "[a]lthough it is a close

---

[1] We need not decide whether the state court's determination that Johnson was deficient by failing to object to the admissibility of the cartoon is entitled to AEDPA deference because, as described below, we hold that the state court's determination that Dodson was not prejudiced by references to the cartoon was reasonable. *See Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."). However, we note that it is not entirely clear whether a conclusion of law that is favorable to the petitioner is entitled to AEDPA deference. In *Daniels v. Lafler*, 501 F.3d 735, 740 (6th Cir. 2007), the Sixth Circuit was "face[d] [with] a state court's treatment of an issue in a manner favorable to the petitioner but not dispositive of his claim for relief." The court applied de novo review, and explained that it would not "apply AEDPA deference to the state court's pro-petitioner resolution of the issue because AEDPA's standard of review is a 'precondition to the grant of habeas relief ('a writ of habeas corpus . . . shall not be granted' unless the conditions of § 2254(d) are met), not an entitlement to it.'" *Id.* (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)). Nevertheless, because here a resolution of this issue is not necessary, we do not address it further.

16

question, the court finds that the introduction of the cartoon did not sufficiently prejudice Dodson's case to merit relief."

Assuming without deciding that Johnson's performance in relation to the Cartoon was deficient, we must determine whether the state habeas court's conclusion that habeas relief was not warranted because Dodson was not prejudiced was "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). We must determine whether it was objectively unreasonable for the state court to determine that there was not a reasonable probability that, but for Johnson's failure to file a motion in limine to prohibit testimony that Dodson wanted to start a family with an inmate and in failing to obtain a ruling on his trial objection, the outcome of Dodson's murder trial would have been different. *See White v. Thaler*, 610 F.3d 890, 910 (5th Cir. 2010).

After a review of the record, we hold that the state habeas court's conclusion that "the cartoon, in all reasonable probability, would not have affected the jury's verdict," is not objectively unreasonable. Dodson confessed to murdering Kaylynn, and "[a] confession is like no other evidence." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (internal quotation marks omitted). "Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Id.* Furthermore, the jury heard Edwards testify that Dodson asked her "what was the difference in an autopsy of a baby who suffocated and one who died of SIDS?" Edwards testified that it was at this point that she began to think that Dodson was "acting uneasy about the thought of an autopsy." This evidence, in combination with Dodson's confession, allows us to conclude that it was not objectively unreasonable for the state habeas court to determine that there was

not a reasonable probability that, but for Johnson's failures, the outcome of Dodson's trial would have been different. *See White*, 610 F.3d at 910. Because the state habeas court decision was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), nor "was [it] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), habeas relief is not warranted.

### 3. Cumulative prejudice analysis[2]

Dodson argues that the state habeas court's prejudice analysis was contrary to *Strickland* because it failed to consider the cumulative effect of counsel's errors. However, Johnson did not engage in multiple instances of deficient performance. Accordingly, assuming without deciding that *Strickland* calls for a cumulative prejudice analysis, Dodson is not entitled to habeas relief under that analysis.

In *Strickland*, the Supreme Court explained that in order to show that counsel's deficient performance prejudiced the defendant, it must be shown that "counsel's *errors* were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687 (emphasis added);

---

[2] The State questions whether Dodson exhausted her state remedies as to this issue. A federal court may not grant habeas relief unless the petitioner "has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). "The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court." *Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999). Dodson's "Objections To The Findings Of Fact And Conclusions Of Law," which were addressed to the Texas Court of Criminal Appeals, begins with a section titled "An Incorrect Prejudice Analysis." Under that heading, Dodson argues that "[t]he trial court conducted a separate prejudice analysis with regard to each allegation of deficient performance," and that "[t]his piecemeal prejudice analysis was incorrect, as Strickland v. Washington, 466 U.S. 668 (1984), requires that a reviewing court consider counsel's errors cumulatively." Since this document was filed in the Texas Court of Criminal Appeals before that court denied Dodson's state writ of habeas corpus application, any exhaustion requirement has been satisfied. *See Mercadel*, 179 F.3d at 275.

*see also id.* at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different." (emphasis added)).  This court has previously applied a cumulative *Strickland* prejudice analysis when confronted with a case in which there were multiple instances of deficient performance by counsel.  *See, e.g.*, *White*, 610 F.3d at 912 (holding, in the alternative, that "[t]he combined prejudicial effect of the post-arrest silence and the death of the unborn child inexorably leads us to conclude that White has shown that the state court's conclusion that there was no reasonable probability of a different outcome is objectively unreasonable"); *Richards*, 566 F.3d at 564 ("We will address each aspect of Davis's performance the district court found deficient before considering whether Richards was cumulatively prejudiced thereby."); *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999) (stating in a pre-AEDPA case that "we are unable to state that . . . the cumulative effect of all deficiencies at the guilt phase[] is sufficient to render the guilty verdict . . . unreliable.").[3]

Nevertheless, Dodson cannot show that the state court's conclusion that there was no reasonable probability of a different outcome is objectively unreasonable because we are not presented with multiple instances of deficient

---

[3] The other circuits to have considered the issue are split as to whether *Strickland* calls for a cumulative prejudice analysis.  *Compare Williams v. Washington*, 59 F.3d 673, 682 (7th Cir. 1995) (stating that "a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was [prejudicial]"), *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1439 (9th Cir. 1995) ("By finding cumulative prejudice, we obviate the need to analyze the individual prejudicial effect of each deficiency."), *and Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir. 1991) (noting that a "claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions"), *with Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998) ("To the extent this Court has not specifically stated that ineffective assistance of counsel claims . . . must be reviewed individually, rather than collectively, we do so now."), *and Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996) (holding that attorney's acts or omissions "that are not unconstitutional individually cannot be added together to create a constitutional violation").

performance to cumulate. As explained above, the state habeas court held that Johnson's failure to file a motion in limine to prohibit testimony relating to a polygraph test was not an example of deficient performance. Similarly, the state habeas court also held that Johnson's failure to object to Erwin's testimony regarding his desire to take a polygraph was not an instance of deficient performance. The only performance that the state habeas court concluded was deficient related to the Cartoon discussed above. Accordingly, because Johnson did not engage in multiple instances of deficient conduct, Dodson cannot show that the state habeas courts' decision was contrary to, or involved an unreasonable application of clearly established federal law as interpreted by the Supreme Court of the United States. As a result, habeas relief is not warranted under a cumulative *Strickland* analysis.

## IV.    CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.